**WASHINGTON NATIONAL INSURANCE COMPANY, an Illinois corporation, Plaintiff,**

v.

**Kenneth A. HENDRICKS and Diane Hendricks, d/b/a Hendricks Group, Defendants.**

No. 93–C–0108–C.

United States District Court, W.D. Wisconsin.

June 23, 1994.

Robert F. Johnson, Cook & Franke, S.C., Milwaukee, WI, for Washington Nat. Ins. Co.

Karl W. Leo, Leo & Associates, Huntsville, AL, for Kenneth A. and Diane Hendricks, Hendricks Group.

## OPINION and ORDER

CRABB, Chief Judge.

This is a civil action for monetary relief for breach of contract and in the alternative for a violation of the Employee Retirement Income Security Act of 1974, §§ 2–4402, as amended, 29 U.S.C. §§ 1001–1461. Plaintiff contends that defendants failed to pay the premiums required under the insurance policy and financing agreement entered into by the parties. Defendants assert several affirmative defenses and counterclaims pursuant to both Wisconsin law and ERISA. They contend that plaintiff terminated the agreements improperly, that they are entitled to rescission of the contracts and that their liability for any outstanding premiums should be offset by the excessive payments they made to plaintiff.

Now before the court are the parties' cross-motions for summary judgment and plaintiff's motion for a default judgment. Plaintiff seeks summary judgment on its claims and on defendants' counterclaims; defendants seek summary judgment on plaintiff's claims and on their own counterclaim for wrongful termination.

Plaintiff contends that defendants' first nine counterclaims are preempted by ERISA, but asserts that its own claims are not preempted. Conversely, defendants assert that plaintiff's claims are preempted, but not their own first nine counterclaims. I

agree with both assertions of preemption and conclude that plaintiff's claims and defendants' first nine counterclaims are preempted by ERISA. Additionally, I conclude that plaintiff has no cause of action under the civil enforcement provisions of ERISA, but that it does have a cause of action for breach of contract under ERISA common law. Finally, I conclude that all of defendants' affirmative defenses and counterclaims are without merit except that the record is insufficient to reach a decision at this time on the merits of defendants' claim that they are entitled to an offset for improperly paid premiums.

For the purpose only of deciding this motion, I find that the following facts are undisputed.

## UNDISPUTED FACTS

Plaintiff Washington National Insurance Company is an Illinois corporation engaged in the insurance business. Defendants Kenneth and Diane Hendricks are both adult residents of Wisconsin. Kenneth Hendricks is the sole owner or 50% owner with Diane Hendricks of a number of businesses throughout the United States. Diane Hendricks is president of one of those businesses, American Patriot Insurance Agency, Inc., and holds an insurance broker's license.

For the purpose of providing the more than 1,000 employees of the Hendrickses' businesses with health and life insurance and disability benefits, Kenneth Hendricks created an unincorporated entity called Hendricks Group, which maintained a bank account through which payments were collected for and dispersed from the various insurance policies that provided benefits to the Hendrickses' employees. Jerome Mancuso served as defendants' broker and consultant on insurance matters.

Before June 1988, Hendricks Group was insured by General American Insurance Company. In 1988, Mancuso recommended that defendants buy insurance from plaintiff Washington National instead. Plaintiff prepared a sales proposal and presented it to Syncor Administrative Services, which acted as a third party administrator of defendants' insurance policies and was the "Broker of Record" for defendants from 1988 to 1990.

During the course of discussions about insurance, plaintiff's sales representative, Robert Schmitke, was told that all the businesses that would be covered by the policies obtained by Hendricks Group were owned by Kenneth Hendricks and that Diane Hendricks was an officer of one of the businesses that would be covered by Hendricks Group's policy. In May 1988, Diane Hendricks signed a Master Insurance Application and Minimum Premium Agreement with plaintiff as the "authorized representative" of "Kenneth A. Hendricks d/b/a Hendricks Group" and identified herself as an officer of one of the companies to be insured.

The insurance policy purchased by defendants defined the health care benefits and the procedures to be used to claim the benefits. The agreement became effective on June 1, 1988. Diane Hendricks signed renewals of the policy in 1989, 1990 and 1991. Schmitke was identified on the policy as plaintiff's Licensed Resident Agent.

Under the policy, plaintiff was obligated to administer the defendants' claims and was responsible for determining benefits payable. Plaintiff had final authority and discretion to determine the benefits payable under the plan. Additionally, plaintiff retained the right to delegate responsibility for the administration of the plan. Kenneth Hendricks was responsible for remitting payments of insurance premiums and for collecting employee contributions. Kenneth Hendricks delegated these responsibilities to Diane Hendricks.

The policy was funded through the Minimum Premium Agreement. As part of the Minimum Premium Agreement, the parties entered into a Post–Termination Liability Agreement and a Deficit Recovery Limit Agreement. The Post–Termination Liability Agreement limited the Hendricks Group's liability after the termination of the Master Agreement to claims incurred before termination but paid within a limited time after termination. Also, this agreement provided plaintiff with the ability to recoup certain accrued deficits in defendants' account. The Deficit Recovery Limit Agreement limited the amount of deficit that plaintiff could re-

cover from defendants to 10% of the yearly deficit. This agreement applied to all but the last year of the contract.

On April 30, 1990, Diana Hendricks informed plaintiff that Mancuso was the new "Broker of Record" for defendants and that "it is expressly understood that notice to Mr. Mancuso's office will be considered notice to Hendricks." On June 22, 1990, Schmitke sent Mancuso a letter authorized by one of plaintiff's vice presidents regarding plaintiff's delinquency and reinstatement procedures. (The procedures are not set forth in the insurance agreement or the Minimum Premium Agreement.) After outlining plaintiff's payment procedures for the policy, Schmitke stated:

Washington National delinquency procedures are:

First and second time delinquency within a twelve month period results in an offer of reinstatement which is subject to the payment of a reinstatement fee of 1.5% of the delinquent premium.

Third time delinquency within twelve month period results in termination with no offer of reinstatement.

In 1991, plaintiff's reinstatement procedures changed to include the requirement that reinstatements be approved by the premium and underwriting departments. However, defendants never received notice of such a change.

On July 1, 1990, Third Party Administrators, Inc., replaced Syncor as the "Broker of Record" for Hendricks Group. Subsequently, plaintiff executed a contract with Third Party Administrators, Inc., for administrative services.

On June 1, 1991, Hendricks Group renewed the Minimum Premium Agreement by signing an appendix to the agreement. At the time of the June 1, 1991 renewal, Hendricks Group had accumulated a deficit of $569,842.79 in unpaid premiums. In June, July and August 1991, defendants' benefit payments did not exceed their claim liability limit, entitling plaintiff to $37,586.73, $99,-635.59, and 22,554,47 in payments.[1] Under the terms of the financing agreement with defendants, plaintiff was entitled to $159,-775.79, rather than the total deficit of $569,-842.79.

In August 1991, Schmitke was terminated by plaintiff for reasons unrelated to his dealings with defendants. On August 29, 1991, plaintiff informed Mancuso that the retrospective premiums for June and July 1991 were due and requested that they be paid. Before August 1991, the defendants had paid all of the retrospective premiums that they were assessed as well as their standard monthly premiums. It had been Mancuso's practice to meet with Schmitke before paying the retrospective premiums, so that Schmitke could explain the calculations concerning the premiums. On October 2, 1991, plaintiff wrote Mancuso asking for payments of the retrospective premium for June, July and August. Plaintiff sent additional letters to the same effect on October 30 and November 4 and 5, 1991. On November 20, 1991, plaintiff wrote again to Mancuso, requesting payment of $159,775.79 in retrospective premiums, and enclosing copies of the letters that had been sent regarding these premiums before August 27, 1991.

On January 24, 1992, Susan Talcott, one of plaintiff's account executives, met with Mancuso in his office in an attempt to collect the retrospective premiums. The meeting was the first opportunity for Mancuso to obtain the type of explanation about the retrospective premiums that he had obtained in the past. On January 25, 1992, Talcott wrote Mancuso requesting that the premiums be paid within five days.

---

1. Defendants contend that there is a genuine dispute of fact as to the amount of the retrospective premiums they owed. The affidavit cited by defendants in support of their contention, however, merely states that because of the plaintiff's allegedly improper waiver of deductibles by employees, the retrospective premiums should be offset by the improperly waived premiums. Although it may be the case that plaintiff owes defendants money for failing to collect premiums properly due, this does not put into dispute the fact that defendants owed retrospective premiums or the amount owed. What defendants believe to be the best method of accounting to determine the amount of the liability does not alter the fact of the underlying liability to plaintiff.

On January 30, 1992, another meeting concerning the retrospective premiums took place among Mancuso, Talcott and others. At the meeting Mancuso was told that the premiums had to be paid. Additionally, Talcott wrote to Mancuso on January 31 and February 5, 1992 requesting payment, and plaintiff's vice president, Hopma, wrote Mancuso on February 5, 1992.

In a letter dated February 7, 1992, Duane Bergman, plaintiff's vice president of the premium department, sent Kenneth Hendricks copies of the letters sent to Mancuso and informed Hendricks that if the retrospective premiums and late fees were not paid by February 20, 1992, defendants' policy would be terminated effective March 1, 1992. Mancuso objected to the request for late fees because there was no provision for late fees in the policy. Plaintiff admits it had no right to late fees under the policy.

On February 7, 1992, Talcott contacted Fran Sautin, who handles employee benefits for defendants, to try to get Mancuso to pay the premiums. Sautin was surprised to learn that plaintiff had been requesting premiums since August of 1991. She attempted to contact Mancuso.

In a letter to Hopma dated February 12, 1992, Mancuso explained that the retrospective premiums had not been paid because of a succession of miscommunications and the need to resolve the issues that had been discussed in the January 24 and 30, 1992 meetings. On February 13, 1992, Schmitke, Diane Hendricks, Talcott, Mancuso and Sautin met to discuss the retrospective premiums.[2] During this meeting, Diane Hendricks and Mancuso informed plaintiff's representatives that they no longer wanted the post-termination liability limit to be part of Hendricks Group's insurance contract. Neither Diane Hendricks nor Mancuso stated that the retrospective premiums would not be paid; they said only that it was necessary to resolve an issue relating to the improper waiver of employee deductibles before the premium would be paid. Talcott represented that she would seek a resolution of these

issues by the following week. Mancuso emphasized the need for the issues to be resolved promptly because Diane Hendricks would be out of the county during the last part of February and the beginning of March 1992.

On February 14, 1992, Talcott sent a message to Mancuso stating that the premiums were due. On February 19, Talcott sent a letter to the effect that if the premiums were not paid, termination procedures would begin. Sautin received a copy of the letter and brought it to Diane Hendricks's attention. Also, on February 19, Mancuso requested a quote on insurance from North American Life Insurance Company. In a letter dated February 19, 1991, Mancuso was told that the retrospective premiums were due by February 21, 1991.

Defendants made no payments of overdue premiums. On February 25, 1992, Bergman informed Kenneth Hendricks that the defendants' insurance policy was terminated effective March 1, 1992, because payment had not been received by February 20, 1992. After receiving the notice of termination, Mancuso tried to have Hendricks Group's policy reinstated. Although Diane Hendricks was out of the country when the notice of termination was received, when she returned, she told Mancuso that Hendricks Group would pay the retrospective premiums if the policy was reinstated. On March 1, 1992, defendants' insurance policy with plaintiff terminated. Also on March 1, 1992, the insurance coverage defendants had obtained from North American Life Insurance Company went into effect. Diane Hendricks had signed a check to North American on February 28, 1992.

On March 3, 1992, Mancuso spoke with David Parrish of plaintiff's underwriting department about the termination of the insurance and the possibility of reinstatement. Mancuso stated that he had a check for $159,775.79 for plaintiff if defendants would reinstate the policy. Plaintiff did not offer to reinstate the insurance. After the termination, plaintiff continued to seek payment of the retrospective premiums.

---

2. The parties do not explain why or in what capacity Schmitke attended this meeting since he

was terminated by plaintiff in August 1991.

Before filing suit, plaintiff notified defendants that they owed $159,775.79 in Monthly Retrospective Premiums; $309,802.45 in Annual Retrospective Premiums, $70,016.18 in Post Termination Premiums; and $90,990.07 in Final Retrospective Premiums. Hendricks Group never paid any of these premiums. Additionally, plaintiff informed defendants that it was entitled to recover an additional $40,000 for benefits it had paid for the treatment of one of defendants' employees, who was injured as a result of medical malpractice.

## OPINION

### A. Default Judgment

Plaintiff has moved pursuant to Fed. R.Civ.P. 55 for the entry of a default judgment against defendants for their failure to file a timely answer to plaintiff's second amended complaint. On December 27, 1993, plaintiff filed a second amended complaint in which it realleged all of the claims of its first amended complaint and added claims under ERISA and the federal common law of ERISA as alternative grounds for relief. Defendants failed to file an answer to this complaint within ten days, as required by Fed.R.Civ.P. 15(a). Three months later, on March 1, 1994, defendants' counsel realized defendants had not filed an answer and did so on March 4, 1994. However, defendants failed to move for leave to file an untimely answer until two months later, on May 2, 1994.

■ Although there is no merit to defendants' assertion that their failure was a mere "technical violation of the time limitation" rules, the drastic sanction of default judgment is not appropriate under the circumstances. Plaintiff has not been prejudiced by defendants' failure to respond to the second amended complaint. The only difference between the second amended complaint and the first amended complaint is the inclusion of alternative causes of action in the event plaintiff's claims were preempted by ERISA. Defendants' denial of the validity of these new claims was completely predictable and could not have caused plaintiff to alter the manner in which it litigated this case. Because defendants have actively pursued this matter in all other respects and plaintiff has not been prejudiced, I will deny plaintiff's motion for default judgment.

### B. ERISA Preemption

■ With limited exceptions, ERISA preempts all state laws relating to employee benefits plans. *Thomason v. Aetna Life Ins. Co.,* 9 F.3d 645, 646 (7th Cir.1993). 29 U.S.C. § 1144(a) provides that ERISA "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." The major exception is the so-called "savings clause," which exempts from ERISA's reach "any law of any State which regulates insurance, banking, or securities." 29 U.S.C. § 1144(b).

■ A determination of preemption is ultimately a question of congressional intent. *Ingersoll–Rand v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990). Congress designed ERISA to "to promote the interests of employees and their beneficiaries in employee benefit plans." *Ingersoll–Rand,* 498 U.S. at 137, 111 S.Ct. at 482 (quoting *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983)); *Maciosek v. Blue Cross & Blue Shield,* 930 F.2d 536, 538 (7th Cir. 1991). The preemption clause "was intended to ensure that plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government." *Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. at 484.

■ In interpreting ERISA's preemption clause, the United States Supreme Court has noted that the clause is "conspicuous for its breadth" and that it "was designed by Congress to establish pension plan regulation as exclusively a federal concern." *Ingersoll–Rand,* 498 U.S. at 138, 111 S.Ct. at 482. The textual basis for the expansive nature of ERISA preemption is the use of the phrase "relates to" in § 1144. *Id.* In interpreting this phrase, the Court has held that an action

'relates to' an employee benefit plan ... if it has a connection or reference to such a

plan. Under this broad common-sense meaning, a state law may "relate to" a benefit plan, and thereby be preempted, even if the law is not specifically designed to affect such plan, or if the effect is only indirect.

*Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. at 483 (citations omitted). All state laws that fall within ERISA's sphere are preempted, even those consistent with the purpose of ERISA. *Mackey v. Lanier Collection Agency & Service,* 486 U.S. 825, 829, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988).

■ Although ERISA's "relates to" language is quite broad, it is not boundless and the term " 'related' must not be taken literally." *Pohl v. National Benefits Consultants, Inc.,* 956 F.2d 126, 128 (7th Cir.1992). The Supreme Court has noted that "some state actions may affect employee benefit plans in too tenuous, remote or peripheral a manner to warrant a finding that the law 'relates to' an employee benefit plan." *Shaw,* 463 U.S. at 100 n. 21, 103 S.Ct. at 2901 n. 21. "[R]un-of-the-mill state-law claims" such as those for "unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan" are not be preempted by ERISA. *Mackey,* 486 U.S. at 833, 108 S.Ct. at 2187. However, as a general matter, state law contract claims involving employee benefit plans are preempted. *See, e.g., Thomason,* 9 F.3d at 646; *Smith v. Blue Cross & Blue Shield,* 959 F.2d 655, 657 (7th Cir.1992).

### 1. Plaintiff's claims

In asserting non-preemption, plaintiff argues that this case qualifies under *Mackey* as a "run-of-the-mill state-law claim" outside ERISA's reach. Plaintiff reasons that because the dispute is over payment under the Minimum Premium Agreement and not over benefits provided by the insurance agreement, it does not implicate the fundamental purpose of ERISA preemption: uniformity and stability in the payment or administration of employee benefits.

The Court of Appeals for the Eleventh Circuit appears to be the only circuit court to have addressed the relationship between ERISA preemption and actions in contract by insurance companies against an employer.

In *First National Life Ins. v. Sunshine–Jr. Food Stores,* 960 F.2d 1546 (11th Cir.1992), the court addressed an insurer's claims for breach of contract and other state law claims stemming from an employer's mishandling of benefit payments and its failure to act in accordance with the terms of a benefit plan. The court held that preemption was mandated by the breadth of ERISA's preemption clause and the "obvious connection" between the insurance contract and the plan. *Id.* at 1550. Although the majority opinion did not address the relationship between preemption and a employer's failure to pay premiums, in a concurring opinion, Judge Clark noted that a claim for premiums by an insurance company would be similarly preempted. *Id.* at 1554.

Plaintiff attempts to distinguish *First National* by relying on two cases in which courts have found contract disputes to be beyond ERISA's scope: *Monarch Cement v. Lone Star Industries, Inc.,* 982 F.2d 1448 (10th Cir.1992), and *Consumer Benefit Association v. Lexington Ins. Co.,* 731 F.Supp. 1510 (M.D.Ala.1990). In *Monarch,* the court found no preemption of a dispute between the buyer of a company and the seller over the allocation of responsibility for certain employee benefits under the contract of sale. The court found that the dispute was limited to assessing the relative responsibilities of the parties for payment and did not affect the administration of the plan or the relationship among any of the principal ERISA entities. *Monarch,* 982 F.2d at 1453. *See also Hospice of Metro Denver v. Group Health Ins. of Oklahoma, Inc.,* 944 F.2d 752 (10th Cir.1991) (no preemption of third-party medical care provider's claim of promissory estoppel for payment from insurer because claim is distinct from participant's claim under insurance contract.) In *Consumer Benefit,* 731 F.Supp. at 1515, the court held that an insurer's claims of breach of contract and fraud against a reinsurer were not preempted by ERISA. As in *Monarch,* the court reasoned that these claims failed to implicate either the concerns of the preemption clause or any policy underlying ERISA but concerned issues "completely collateral" to the relevant benefit plan.

Plaintiff contends that this action is like *Monarch* and *Consumer Benefit* because it concerns the terms of a contract unrelated to the employee benefit plan. However, *Monarch* and *Consumer Benefit* involved disputes over agreements that provided no benefits and involved at least one party who had no direct responsibility to the benefit plan. In contrast, this case involves a dispute about the benefits agreement between entities that have responsibilities under ERISA.

■ Defendants' failure to pay the retrospective premiums did not threaten merely to terminate the Minimum Premium Agreement; it actually caused the termination of the insurance agreement that provided for employee benefits. Plaintiff's termination of the insurance agreement was motivated by the alleged violations of both the terms of the insurance agreement and the Minimum Premium Agreement. Additionally, both parties have direct responsibilities under the plan: plaintiff is a fiduciary under the plan and defendants are the plan's sponsors.

The dispute over unpaid premiums presents the same type of "obvious connection" to ERISA that the court found required preemption in *First National*, 960 F.2d 1546. Given the breadth of ERISA preemption and the general presumption that contract claims are preempted, I conclude that plaintiff's contract claims are preempted by ERISA.

## C. Defendants' Counterclaims

■ In defendants' first nine counterclaims, they allege: 1) wrongful termination of insurance; 2) breach of fiduciary duty; 3) bad faith termination; 4) misrepresentation of the anniversary date of the Minimum Premium Agreement; 5) misrepresentation concerning forgiveness of retrospective premiums; 6) misrepresentation of the Post–Termination Liability Amendments; 7) improper administration of the policy by waiving deductibles; 8) improper administration of payment of certain medical expenses; and 9) improper preparation of the insurance policy. Defendants concede that if plaintiff's claims are preempted, then their own second, seventh and ninth counterclaims are preempted as well. Although counterclaims are independent claims that stand or fail on their own merits, defendants' concession is wise.

These claims concern disputes about the initiation and administration of the plan and would have been preempted regardless of the status of plaintiff's claims. Defendants' eighth counterclaim is preempted on its face as well because it too involves a dispute about the administration of the plan. *See Maciosek v. Blue Cross & Blue Shield*, 930 F.2d at 539.

In the fourth, fifth and sixth counterclaims, defendants set forth various types of misrepresentations that allegedly caused them to renew the Minimum Premium Agreement. Although the general rule is that state law fraud claims are preempted by ERISA, *see, e.g., Reilly v. Blue Cross Blue Shield*, 846 F.2d 416, 426 (7th Cir.1988), defendants contend that these counterclaims are "fraud in inducement" claims that should be exempted from the general rule. The Court of Appeals for the Seventh Circuit has not decided this question, but two other circuits have held such claims to be preempted. *See Consolidated Industries v. New York Life Ins.*, 949 F.2d 960, 964 (8th Cir.1991) (misrepresentation in sale of 401(k) turnkey plan preempted by ERISA); *Sanson v. General Motors Corp.*, 966 F.2d 618, 621 (11th Cir.1992) (misrepresentation relating to retirement benefits to induce early retirement preempted); *but see Perry v. P\*I\*E Nationwide, Inc.*, 872 F.2d 157 (6th Cir.1989) (fraudulent inducement to join plan not preempted when misrepresentation claim does not relate to any benefit under the plan).

■ Defendants are contending that the misrepresentations caused them to renew the Minimum Premium Agreement. Defendants' contention distinguishes this case from *Perry*, which involved initial inducements to join a benefit plan. Defendants assert that they were induced under false pretenses to continue both purchasing insurance and using a financing agreement. Because these alleged misrepresentations are part of a broader course of conduct and dealings between the parties, the allegations are sufficiently related to the plan at issue to be preempted.

■ Defendants attempt to avoid preemption with respect to their first and third counterclaims by relying on the "savings

clause" of § 1144, which exempts from preemption all state laws that "regulate the insurance, banking, or securities industry." 29 U.S.C. § 1144(b)(2)(A). Defendants have brought both of these claims under both state law and ERISA, without acknowledging the Seventh Circuit's admonition that "whatever the exact parameters of the savings clause, it cannot be read to save an application of a state statute that mimics ERISA's" remedies. *DeBruyne v. Equitable Life Assur. Soc. of the U.S.*, 920 F.2d 457, 470 (7th Cir.1990). Defendants have not explained their reason for asserting that the savings clause should be read to preserve their state law counterclaims when they believe they have sufficient remedies under ERISA, but I will consider their contentions nonetheless.

In their first counterclaim, defendants allege that plaintiff breached the insurance contract by terminating defendants' coverage without adequate notice and by failing to reinstate the coverage. Although defendants refer only to breach of contract, they explain in their brief that this claim is not based on a violation of a contract between plaintiff and defendants, but on the notice requirements for terminating insurance policies under Wisconsin law, Wis.Stat. §§ 631.36 and 632.79.

■ Defendants' failure to plead a violation of Wisconsin law in their complaint is a sufficient reason to dismiss this counterclaim. A second reason is the language of Wis.Stat. § 632.79, which governs the termination of group medical insurance coverage and which exempts from its notice requirements any termination of medical insurance that "is immediately replaced by another policy or plan providing similar coverage." Wis.Stat. § 632.79(5).[3] It is undisputed that upon termination of plaintiff's plan, defendants had coverage through their policy with North

American. Nothing in the record suggests that this policy did not provide for defendants' insurance needs. Therefore, even if ERISA's savings clause prevented Wis.Stat. § 632.79 from being preempted, defendants would not have a cause of action under it.[4]

■ In their third counterclaim, defendants allege that plaintiff acted in bad faith by terminating the insurance agreement. In *Smith*, 959 F.2d 655, the Court of Appeals for the Seventh Circuit rejected the claim that Wisconsin's contract law concerning bad faith "regulates" the insurance industry within the meaning of 29 U.S.C. § 1144(b)(2)(A) and held that claims under the Wisconsin law of bad faith were preempted by ERISA. However, defendants contend that the court of appeals did not appreciate that the Wisconsin law of bad faith fulfilled the test outlined in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), for determining whether a state law regulates insurance. Contrary to defendants' assertion, the court did explore the basis of a bad faith claim under Wisconsin law and *Pilot Life*'s application to such a claim. I find no reason to depart from *Smith* in this case.

### D. Plaintiff's Claims Under ERISA and ERISA Common Law

A finding that plaintiff's claims are preempted makes it necessary to consider whether plaintiff has a cause of action under either ERISA or ERISA common law.

#### 1. Civil enforcement under ERISA

ERISA's civil enforcement provision, 29 U.S.C. § 1132, sets out six ways in which plan participants, beneficiaries and fiduciaries and the Secretary of Labor can bring actions under ERISA. The parties do not

---

**3.** Defendants contend that plaintiff was bound to follow the notice requirements of Wis.Stat. § 631.36 in addition to Wis.Stat. § 632.79 in terminating defendants insurance. However, Wis.Stat. § 631.36 provides only the general rules regarding termination of insurance policies and states that it does not apply if other statutes are applicable. Wis.Stat. § 631.36(1)(a). Since Wis.Stat. § 632.79 squarely covers this issue and there is no basis on which to conclude that § 631.36 should be applied in conjunction with § 632.79, I conclude that to the extent that Wis-

consin law applies to this case, § 631.36 is inapplicable.

**4.** I note that in one of defendants' submissions, they have suggested that the North American policy may not have been in place at the time of the termination of the plaintiff's policy. However, these allegations cannot be considered because defendants did not make them the subject of any proposed findings of fact.

dispute that plaintiff's only possible remedy under ERISA would be as a fiduciary, for which it qualifies by its "exercise [of] discretionary authority or control" over the management, assets or the administration of an employee benefit plan. 29 U.S.C. § 1002(21)(A). Plaintiff had the authority to determine what benefits were to be paid under the plan and had responsibility for the administration of the plan. Under § 1132,

> A civil action may be brought—
> (3) by a participant, beneficiary, or **fiduciary** (A) to enjoin any act or practice which violates the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provision of this subchapter or terms of the plan.

29 U.S.C. § 1132 (emphasis added). Although no court has decided whether an insurer acting as fiduciary can bring an action under ERISA to recover premiums from an employer, plaintiff asks the court to adopt the reasoning of Judge Clark's concurring opinion in *First National*, 960 F.2d at 1550, to allow recovery in this case. Judge Clark explained that he would hold that an insurance company could recover premiums under § 1132 because an employer has the obligation as co-fiduciary under a plan to provide the accounting necessary to allow the administration of the plan. Judge Clark reasoned that the right to bring an action to collect premiums would be included within a fiduciary's right to obtain an accounting under § 1132(a)(3)(B)(ii), which provides that the a fiduciary can bring "an action to enforce … the terms of the plan." *Id.*

▌ However, as Judge Clark acknowledges, § 1132(a)(3)(B) empowers a fiduciary only to "obtain other appropriate equitable relief" and an action for the recovery of premiums cannot "be strictly classified as 'equitable.'" *Id.* Moreover, the Supreme Court's decision in *Mertens v. Hewitt Associates*, —— U.S. ——, ——, 113 S.Ct. 2063, 2068, 124 L.Ed.2d 161 (1993), has foreclosed the possibility that legal damages can be awarded under § 1132. Additionally, as pointed out by the majority in *First National*, actions under § 1132 are generally permitted to benefit the plan itself rather than a

fiduciary and generally, a fiduciary owes no duty to another fiduciary, but only to the plan. *Id.* at 1551. Further, it is difficult to accept Judge Clark's conclusion that an employer can be deemed to be a "co-fiduciary" without analyzing whether the employer meets ERISA's definition of a fiduciary. Additionally, Judge Clark does not explain why the employer from whom premium payments are sought would have to be classified as co-fiduciary to provide the basis for a § 1132 action. Section 1132 requires only that a fiduciary bring the action; it does not mandate that the action must be brought against another ERISA entity. Actions brought against a fiduciary for breach of duty are covered by a separate section of ERISA: 29 U.S.C. § 1109.

Judge Clark addresses these difficulties by acknowledging that his interpretation might not completely reconcile the language of ERISA, but adds

> [a]ny other interpretation of the statute would frustrate the intention of the statute to include medical insurance plans within the provisions of ERISA. Insurance companies would be reluctant to engage in writing such policies if their rights to collect premiums were limited first by a interpretation that ERISA preempts all claims by such companies against employers, and then by an interpretation of ERISA that would limit such claims to equitable claims and provide relief for only beneficiaries of such plans.

*Id.*

Although I agree with the conclusion that the purposes underlying ERISA would be frustrated by interpreting ERISA to render unenforceable insurance contracts for medical coverage, I cannot follow Judge Clark's approach to reconciling the language of the statute with its purpose because *Mertens* precludes an award of legal damages under § 1132. Parenthetically, I note that for reasons to be discussed below, none of the defendants in this case qualify as fiduciaries. Therefore, they could not be classified as co-fiduciaries under § 1132, even if such a classification were necessary to maintain a § 1132 action.

■ In recent correspondence to the court, plaintiff has implied that it may have a claim for restitution under § 1132. However, the only argument plaintiff has raised in its briefs relating to § 1132 was its request that Judge Clark's reasoning in *First National* be applied to this case.[5] Although plaintiff might have a claim from restitution under § 1132, it has waived it by its failure either to raise this argument in any of its briefs on summary judgment or to try to support its position with any analysis for a claim for restitution under § 1132. Additionally, I note that the remedy plaintiff has requested—that agreements between the parties be enforced and that it be compensated according to the agreements—is a request for contract damages, rather than for the equitable remedy of restitution. Therefore, I find that plaintiff has no cause of action under § 1132 of ERISA.

## 2. Enforcement under ERISA common law

■ Although ERISA itself does not provide a remedy for plaintiff, the court has recognized that "Congress in passing the statute expected 'a federal common law' of rights and obligations under ERISA-regulated plans would develop." *Thomason,* 9 F.3d at 647 (quoting *Pilot Life,* 481 U.S. at 56, 107 S.Ct. at 1557). The existence of a federal common law of ERISA derives from the recognition of the expansiveness of the preemption clause. *UIU Severance Pay Trust Fund v. Local Union No. 18–U, United Steelworkers of America,* 998 F.2d 509, 512 (7th Cir.1993). Given the scope of ERISA preemption, ERISA can remain workable only through allowing interstitial development of areas of the law that are preempted but not addressed by the statute. In constructing a federal common law of ERISA, courts may employ ordinary common law concepts to the extent that they fulfill the underlying purposes of ERISA. *Thomason,* 9 F.3d at 647; *Fox Valley & Vicinity Construction Workers Pension Fund v. Brown,* 897 F.2d 275, 281 (7th Cir.1990).

Although plaintiff did not specify in its complaint the nature of the cause of action it is asserting under federal common law, it mentions in its brief several different forms of equitable and quasi-contractual relief that it believes to be available. However, plaintiff's most obvious remedy under federal common law is an action for breach of contract, an action that has been held to be maintainable under ERISA common law. *Arber v. Equitable Beneficial Life Insurance Co.,* No. Civ. A. 93–CV–6458, 1994 WL 121631 *10–11 (E.D.Pa. April 4, 1994); *Winstead v. Indiana Insurance Co.,* No. 86 C 3414, 1987 WL 15750 (N.D.Ill. August 12, 1987).

■ Allowing a federal common law action for breach of contract does not undermine any of the objectives of ERISA. In fact, it will fill an obvious shortcoming in the statute. The Court of Appeals for the Seventh Circuit has been willing to allow common law actions when the consequences of preventing such actions would make the pension system unworkable. For example, in *UIU Severance,* 998 F.2d 509, the court recognized that an employer could maintain a federal common law claim of restitution for improper contributions to a plan even though the employer had no explicit remedy under ERISA. The court of appeals reasoned that if employers were not "permitted to seek recovery of mistaken contributions, they may be less inclined to sponsor ERISA plans at all. This would undermine ERISA's goal of expanding pension and welfare benefit coverage." *Id.* at 513.

This case presents at least as compelling a basis to find a federal common law cause of action as did *UIU Severance.* As Judge Clark observed in *First National,* severe consequences would follow if insurance companies were prevented from enforcing the payment provisions of medical insurance contracts. Insurance companies would have to find means other than contracts for securing their right to payment, which might cause companies to reconsider writing medical benefit policies or, at least, require a restructur-

**5.** Plaintiff has mentioned restitution only in the context of possible claims under ERISA common law.

ing of the insurance industry in the medical benefits area. It is improbable that Congress intended ERISA to have this effect. Allowing a federal common law contract action does not pose any threat of subjecting ERISA plans to a type of judicial interpretation that Congress would have found objectionable; ERISA plans are already interpreted as a matter of the federal common law of contracts. *Bullwinkel v. New England Mut. Life Ins. Co.*, 18 F.3d 429 (7th Cir.1994). Therefore, I conclude that plaintiff can maintain an action for breach of contract under the federal common law of ERISA.

Plaintiff contends that defendants owe a total of $670,585.11 under the Agreement. Specifically, plaintiff contends that defendants owe: $159,775.79 in monthly retrospective premiums (count I); $309,802.45 in annual retrospective premiums (count II); $70,016.18 in Post Termination Premiums (count III); $90,990.07 in Final Retrospective Premiums (count IV); and $40,000 in individual claim pooling reimbursements (count V). Defendants do not challenge plaintiff's calculations of the amounts owed under the contract; rather, they contend that they are entitled to rescission of the contract, that plaintiff terminated the contract improperly and that any recovery by plaintiff must be offset by other improperly charged premiums. Therefore, it is necessary to evaluate defendants' counterclaims and affirmative defenses.

### E. Defendants' Counterclaims and Affirmative Defenses

In addition to defendants' first nine counterclaims that are preempted and defendants' affirmative defense that plaintiff's claims are preempted, defendants allege thirteen additional counterclaims and eight additional affirmative defenses. Many of these claims are duplicative of each other and differ only with respect to the capacities in which defendants are asserting them. Because counterclaims are independent claims, defendants must demonstrate that they are entitled to bring these claims. Therefore, it is necessary to decide first whether defendants can maintain any of these counterclaims and then evaluate any remaining counterclaims along with defendants' properly pleaded affirmative defenses.

### 1. Counterclaims

Defendants do not state the specific bases upon which they bring their tenth through twenty-second counterclaims; instead, they label the counterclaims generally as being brought pursuant to ERISA or ERISA common law. However, in their briefs, defendants contend that they can maintain their tenth through fifteenth counterclaims as brought by Kenneth and Diane Hendricks in their individual capacities as plan participants under § 1132(a)(1). A participant is defined as a employee who is or may become eligible for benefits under a benefit plan. 29 U.S.C. § 1002(7). Defendants proposed no findings of fact to the effect that either Kenneth or Diane Hendricks participated in the benefit plan that included the insurance provided by the plaintiff that they provide to their employees. Even if I were prepared to overlook this omission and allow defendants' tenth through fifteenth counterclaims to go forward, these claims could not succeed.

Section 1132(a)(1) permits a participant or beneficiaries to request information from a plan administrator, § 1132(a)(1)(A), and

> to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights for future benefits under the terms of the plan....

29 U.S.C. § 1132(a)(1)(B). In defendants' tenth through fifteenth counterclaims, they allege various misrepresentations, improper payments and improper waivers of deductibles, none of which relate to Kenneth or Diane Hendricks's ability to recover benefits or to enforce or clarify their rights under the terms of the plan. In fact, there is no evidence that either Kenneth or Diane Hendricks's benefits have been affected by any of plaintiff's actions or by the replacement of plaintiff with another insurance carrier. Since the language of § 1132(a)(1) is clear about the nature of the claims that can be brought and defendants have not provided any explanation why a participant under § 1132(a)(1) can bring the types of claims

they have asserted, these counterclaims will be dismissed.

■ Defendants argue in their brief that their thirteenth through fifteenth counterclaims could be brought as an action for restitution in their capacities as employers under *UIU Severance*, 998 F.2d 509. Although defendants are correct that employers can bring actions for restitution under the federal common law of ERISA, their position throughout has been that they are suing as participants. They cite nothing to support the proposition that they can maintain the same cause of action in two different capacities simultaneously. I will deny their counterclaims for restitution brought purportedly in their capacities as employers.

■ Defendants' sixteenth through twenty-second counterclaims are brought allegedly by Kenneth Hendricks as a fiduciary for Hendricks Group. ·As previously discussed, a fiduciary under ERISA is one who "exercises discretionary authority or control" over the management, assets or administrations of a plan. 29 U.S.C. § 1002(21)(A). Kenneth Hendricks does not fulfill this definition. It was plaintiff that was responsible for administering, managing and making payments under the plan and that had the final authority to make judgments about benefits under the plan. Kenneth Hendricks's only role was to collect and submit documents to plaintiff that would allow plaintiff to process employee claims. Kenneth Hendricks's responsibilities were merely "clerical, mechanical, ministerial—not discretionary" and by definition not a fiduciary's duties under ERISA. *Pohl*, 956 F.2d at 129. Further, as indicated by *UIU Severance*, 998 F.2d 509, an employer that makes contributions to a plan does not become a fiduciary merely by making contributions. Defendants' sixteenth through twenty-second causes of action must be dismissed as not stating a viable claim for relief because Kenneth Hendricks does not qualify as a fiduciary.

## 2. Affirmative defenses

Defendants' first affirmative defense is that plaintiff is preempted from bringing its claims. I have already dealt with the issue of preemption and will not address this issue

again. Plaintiff's remaining affirmative defenses relate to the proper interpretation of the insurance agreement along with a few other related issues.

As I have noted, in interpreting ERISA plans I am guided generally by the federal common law of contracts and specifically by the Seventh Circuit's method of interpretation. The court of appeals has explained its method by stating: "We interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience and we construe ambiguities in ERISA plans against the drafter." *Meredith v. Allsteel, Inc.*, 11 F.3d 1354, 1358 (7th Cir.1993).

### a. wrongful termination

Although the policy at issue contained no reinstatement clause, defendants contend that the letter Mancuso received from Schmitke in 1990 outlining procedures for payment of delinquencies and for reinstatement became part of the insurance policy and obligated plaintiff to offer reinstatement. Alternatively, defendants argue that if the letter did not become part of the policy, plaintiff should be estopped from denying its applicability.

The first question is whether the letter can be deemed to be part of the insurance policy. The policy provides,

[o]nly an executive officer can approve a change to the policy; and any such change must be endorsed or attached to it. No agent has the authority to change or waive any policy provision.

As a sales agent, Schmitke is not an executive officer of plaintiff. Moreover, the letter was not "endorsed or attached" to the policy. However, defendants contend that the letter was prepared from a memorandum sent by Vice President Hopma to all salespeople, requiring them to send the provision to their customers.

■ I find that the letter did not become part of the insurance agreement. ERISA requires that all plans be in the form of "written instruments," 29 U.S.C. § 1102(a)(1), and that they contain formal procedures for amendment, 29 U.S.C.

§ 1102(b)(3). In this case, there is no ambiguity concerning the procedures required to amend the policy. The agreement must be enforced on the basis of its terms. The letter did not comply with the agreement's requirements for amendment; therefore, it cannot be considered to be part of the plan.

■ Although the letter did not become part of the policy, defendants may have a claim for waiver or estoppel under ERISA common law. *See Thomason,* 9 F.3d at 650. However, such a claim would be of no help to the defendants because plaintiff complied with the terms of the letter in terminating defendants' policy. Defendants were not terminated until they were delinquent three times in a twelve month period after failing to make the June, July and August payments. Under the procedures outlined in the letter, plaintiff had no obligation to offer reinstatement after a third delinquency. Therefore, defendants were not entitled to reinstatement even under the terms set forth in the letter.

■ Defendants make one last try. They contend that they are entitled to reinstatement under the letter because the initial notices for the June and July deficiency were sent together, making the August notice only the second and not the third notice of delinquency. Additionally, defendants argue that plaintiff should have terminated their account after the first and second delinquency and then offered reinstatement, instead of just requesting the premiums and late fees. These arguments are unpersuasive. At most the reinstatement procedures required plaintiff to allow defendants to continue under the plan if they missed two payments, not three. Once defendants became delinquent on a third payment in a twelve-month period they were no longer protected by the reinstatement procedures and were properly terminated. As for the notice issue, the record is replete with examples of plaintiff's attempts to inform defendants of their obligations and the consequences of failing to discharge them.

### b. automatic termination

As an alternative defense to their claim of wrongful termination, defendants argue that the Minimum Financing Agreement terminated in September of 1991, when they became delinquent in the retrospective premium payments for June and July. The Minimum Premium Agreement provides that if defendants failed

> to provide funds necessary to satisfy its obligations and liabilities hereunder . . . this Agreement shall terminate immediately.

According to defendants, this provision means that any payment that became overdue caused the automatic termination of the agreement and limited defendants' liability to $302,157.18, entitling defendants to a refund of all the premiums paid to plaintiff after the agreement terminated.

Plaintiff responds that both parties continued to act as if the agreement was in force until the termination of March 1, 1992, except for defendants' failure to pay premiums. Therefore, plaintiff argues, even if the immediate termination provision is construed to require termination as soon as any payment is late or missed, the parties' conduct demonstrates no intention to terminate either the policy or the agreement under which the policy was financed.

■ Although the parties have not cited any authority for their positions, I understand plaintiff to be asserting essentially that defendants' continued performance and receipt of benefits under the agreement waives defendants' right to assert that the agreement terminated. As previously discussed, the Seventh Circuit has recognized that it may be appropriate to apply principles of waiver to causes of action under ERISA common law. *Thomason,* 9 F.3d at 650. To state a valid claim of waiver the waiving party must received some consideration or benefit from the relinquishment of a right. *Id.* at 648. The court explained that

> [t]he specific applicability of [principles of estoppel and waiver] to contracts of insurance is based upon the recognition that to allow either party . . . to set up his own wrong as a defense to an obligation incurred under a policy, where such policy has been issued and held in good faith as an indemnity and where premiums have

been paid and received under it, would not only be manifestly unjust, but contrary to settled rules of law.

*Id.* (quoting 44 Am.Jur.2d *Insurance* § 1574 (1982)). To allow defendants to evade their obligations under the Minimum Premium Agreement on the basis of the termination provision after they have received benefits under the agreement would allow defendants to use their "own wrong" to defeat their obligations. Because plaintiff and defendants continued to behave as if the agreement was in force after the termination provision would have been triggered, the effect is a waiver of this provision of the agreement by the parties.

Even if I were to find that the agreement terminated and no waiver principle applied, there is no merit to defendants' contention that they owed no premiums after September 1991. The Minimum Premium Agreement provides that in the event of termination, when the policy stays in force, defendants are obligated to pay whatever amounts plaintiff sets for premiums. Defendants have provided no evidence to show that if the Minimum Premium Agreement had terminated, plaintiff would not have set the premiums at the same level that plaintiff now contends defendants owe.

■■■ Even if this provision of the Minimum Premium Agreement does not apply and even if the entire agreement between the parties had terminated in September 1991, plaintiff would not be without a remedy to collect the unpaid premiums. Plaintiff could bring a claim in quasi-contract for unjust enrichment for the services it provided without payment after the contract had terminated. *See Provident Life & Acc. Ins. Co. v. Waller*, 906 F.2d 985, 993 (4th Cir.1990) (recognizing quasi-contract cause of action under ERISA common law for unjust enrichment).

#### c. misrepresentation

Defendants contend that plaintiff made fraudulent inducements concerning the retrospective premiums owed, the anniversary date of the contract and the meaning of the post-termination liability agreement and that these misrepresentations are all grounds for rescinding the contract. However, defendants have failed to propose any facts relating to these alleged misrepresentations. Therefore, it is unnecessary to consider them. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir.1994) (proposed facts not submitted in compliance with court rules are properly disregarded in deciding a motion for summary judgment).

#### d. improper payment of medical expenses

■■■ Defendants contend that the policy's "Coordination of Benefits Provision" bars plaintiff from recovering on its fifth cause of action for reimbursement for payments made to treat one of defendants' employees who was injured as a result of medical malpractice. Defendants suggest that under the coordination of benefits provision of the policy, plaintiff was required to attempt to collect payments from other available insurance policies that might cover the employee's injuries before paying the benefits itself.

The coordination of benefits provision of the policy provides a set of rules for allocating responsibility for payments for an employee's treatment between the plaintiff's plan and other plans that may provide coverage. The policy defines a "plan" by listing examples of types of insurance that would constitute alternative plans to which plaintiff is required to look for payment. Plaintiff is obliged to collect any sums payable from an alternative plan before making payments itself.

Malpractice insurance does not appear on the list of the types of insurance coverage that might constitute an alternative plan from which plaintiff would have an obligation to collect. Additionally, defendants have not suggested that malpractice insurance is included within any of the listed categories of plans under the agreement. Defendants contend only that the risk management department of the hospital where the malpractice occurred was listed on some of the employees' claim forms is an additional source of coverage. However, nothing in the agreement suggests that plaintiff was required to seek payment from any source not listed as a

plan under the contract. Defendant has cited no authority to warrant such a conclusion. Therefore, I find no reason to conclude that plaintiff violated its obligations under the Coordination of Benefits Provision by paying for the employee's treatment.

### e. improper waiver of deductibles and policy preparation

Defendants allege as affirmative defenses that plaintiff improperly waived the requirement that employees pay deductibles for outpatient treatment. In the alternative, defendants argue that if these deductibles were properly waived under the terms of the agreement, then plaintiff prepared the agreement improperly. These claims are brought as an offset against any amount plaintiff may recover. I note that these defenses are related to defendants' failed attempt to bring a counterclaim for restitution under ERISA common law. The parties do not address whether this claim is brought properly as a compulsory counterclaim under Fed.R.Civ.P. 15(a) rather than as an affirmative defense.

Even if these claims can present affirmative defenses, neither party has discussed in any detail the legal issues involved in these claims. As the factual bases for these claims, defendants have proposed several facts that relate to these issues but contend in their briefs that there are genuine issues of material fact to be determined. Plaintiff's only response to defendants' proposed findings of fact is to contend that these claims do not relate to its summary judgment motion.

Because none of the parties have addressed the law or facts surrounding these defenses, it is not possible to rule on these issues at this time. Therefore, the parties will be given the opportunity to brief this issue and explain more fully the legal and factual bases for these claims. The parties should be aware that their submissions are to be limited to the availability of these two defenses. Submissions should not merely refer back to previously filed briefs, but should contain all the legal arguments and proposed findings of fact necessary to resolve these issues.

### f. Diane Hendricks's liability

Diane Hendricks asserts that she is not personally liable for any of the unpaid premiums sought by plaintiff because she signed the agreements between the parties as the authorized representative of Kenneth Hendricks, d/b/a Hendricks Group, and she is not liable for the acts of her principal. Plaintiff responds that since Hendricks Group is not a corporation or a formal entity and since Diane Hendricks identified herself as an officer of one of the companies to be insured, she was acting as an agent for an undisclosed principal and is therefore personally liable on the contracts.

Plaintiff has cited no authority for the proposition that Diane Hendricks could not sign a contract on behalf of Kenneth Hendricks or Hendricks Group just because Hendricks Group is not a corporation. Agency relationship can exist between persons, as well as between persons and entities such as corporations. Further, it is undisputed that plaintiff's agent Schmitke was informed that the insurance coverage was for defendants' various business. It does not appear that plaintiff was unaware that Kenneth Hendricks would be responsible for payments. Therefore, I find no basis on which to conclude that Diane Hendricks is liable personally for the unpaid premiums to the extent that she signed the contracts on as an agent of Kenneth Hendricks, d/b/a Hendricks Group. This holding does not affect Diane Hendricks's liability for the payment of unpaid premiums in any of her other capacities.

### ORDER

IT IS ORDERED that plaintiff Washington National's motion for summary judgment is GRANTED against Kenneth A. Hendricks, d/b/a Hendricks Group, on all counts; defendant Kenneth A. Hendricks, d/b/a Hendricks Group, is to pay plaintiff $670,585.11; and the motion for summary judgment of defendant Kenneth A. Hendricks, d/b/a Hendricks Group, is DENIED.

Further, IT IS ORDERED that defendant Kenneth A. Hendricks, d/b/a Hendricks Group, is to file and serve a memorandum of law and proposed findings of facts relating to

his affirmative defense of offset no later than July 8, 1994. Plaintiff is to file and serve its response by July 22, 1994. Defendant shall file and serve a reply no later than July 30, 1994.

Finally, IT IS ORDERED that the entry of the judgment in plaintiff's favor shall be stayed pending the disposition of defendants' remaining offset defenses.