**Dolores AMATUZIO, et al., Plaintiffs,**

**v.**

**GANDALF SYSTEMS CORPORATION, et al., Defendants.**

**William CHAMBERS, et al., Plaintiffs,**

**v.**

**GANDALF SYSTEMS CORPORATION, et al., Defendants.**

**Civil Action Nos. 95–4808(JEI), 96–621(JEI).**

United States District Court, D. New Jersey.

Feb. 4, 1998.

Mattioni, Mattioni & Mattioni, LLP by Joseph F. Bouvier, Westmont, NJ, for plaintiffs.

Obermayer, Rebmann, Maxwell & Hippel by Stephen D. Schrier, James M. Penny, Jr., Marjorie H. Gordon, Haddonfield, NJ, for defendants.

## AMENDED OPINION

IRENAS, District Judge.

This matter comes before this Court on defendants Gandalf Systems Corp. and Gandalf Technologies, Inc.'s motion for summary judgment as to all claims in this action, and plaintiffs' cross-motion for summary judgment as to all claims. The disputes in this action arise out of a severance pay plan covered by the Employee Retirement Income Security Act ("ERISA"), and defendants' obligation under the Worker Adjustment and Retraining Notification Act ("WARN"), to give affected employees notice of a mass layoff and/or plant closing. This Court has jurisdiction under 28 U.S.C. § 1331.

For the reasons that follow, this Court will: (1) find that Class One and Class Two plaintiffs have standing under ERISA, but that Class One Subclass "A" plaintiffs lack standing; (2) deny both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to plaintiffs' claim that they are entitled to vested benefits; (3) deny both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to all plaintiffs' equitable estoppel claims; (4) grant defendants' motion for summary judgment as to plaintiffs' claims that the severance plan modification is void because plaintiffs were not timely noticed of the severance plan modification and were not timely given a summary plan benefits description, and deny plaintiffs' cross-motion for summary judgment as to these claims; (5) deny both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to plaintiffs' claim that the severance plan modification was invalid because defendants did not follow the plan's amendment

procedure; (6) deny defendants' motion for summary judgment as to Class Two plaintiffs' WARN claim, and grant plaintiffs' cross-motion for summary judgment as to Class Two plaintiffs' WARN claim; and, (7) deny both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to Class Three plaintiffs' WARN claim.

# I. BACKGROUND

## A. *Procedural History*

Plaintiffs Dolores Amatuzio et al. commenced this action by filing by the Complaint in Civil Action No. 95–4808 on September 19, 1995. On February 20, 1996, plaintiffs William F. Chambers et al. (Chambers) filed the Complaint in Civil Action No. 96–621. Chambers filed the Amended Complaint in No. 96–621 on April 25, 1996.

By Order dated June 4, 1996, this Court ordered the consolidation for all purposes of Civil Action Nos. 95–4808 and 96–621 under the lead case number of 95–4808. By Consent Order Concerning Class Certification dated June 17, 1996, the Magistrate Judge certified the three classes of plaintiffs described below in Part I.B. By Order dated October 18, 1996, the Magistrate Judge granted Chambers leave to file a second amended complaint. Chambers filed the Second Amended Complaint in No. 96–621 on October 21, 1996, carving out the subclass of plaintiffs as described below in Part I.B.

On June 7, 1996, defendants Gandalf Systems Corp. and Gandalf Technologies, Inc. ("defendants") filed a motion to dismiss and to strike. By Order dated July 5, 1996, this Court denied the motion to dismiss the First Count of the Complaint in No. 95–4808 and the First Count of the Amended Complaint in No. 96–621. By the same Order this Court granted defendants' motion to dismiss those portions of the Second Count of the Complaint in No. 95–4808 and the Second Count of the Second Amended Complaint in No. 96–621 that were brought pursuant to the Employment Retirement Income Security Act § 510, 29 U.S.C.A. § 1140.

Defendants filed the instant motion for summary judgment as to all remaining counts and claims in this consolidated action on October 24, 1997. On the same date plaintiffs filed the instant cross-motion for summary judgment as to all remaining counts and claims.

## B. *Parties, Plaintiff Classes and Claims*

Defendant Gandalf Systems Corp. ("GSC") is a New Jersey-based company engaged in the design, marketing and sale of telecommunications products and services. Defendant Gandalf Technologies, Inc. ("GTI"), a Canadian corporation, is GSC's parent company. GSC was created in 1991 when Gandalf Data, Inc. ("GDI") merged with Infotron Systems Corporation ("Infotron"). At all times relevant to this action GSC was headquartered in a Cherry Hill, New Jersey, facility formerly occupied by Infotron. The majority of GSC's Cherry Hill employees were former Infotron employees who had remained with GSC following the 1991 Infotron/GDI merger.

Plaintiffs are former employees of GSC who worked in Cherry Hill and who ceased to be employed by GSC at various times between January 14, 1994, and August 31, 1994. Plaintiffs are divided into three classes and one subclass. Eight named plaintiffs ("the individual plaintiffs")—also members of Class One and Class Two—bring individual claims. Class One plaintiffs are former GSC employees who received notice from GSC on February 22, 1994, that they would be laid off on or after April 25, 1994, and WARN [1] notice of a plant closing scheduled to take place on or after April 25, 1994. Class One Subclass "A" ("Subclass 'A'") plaintiffs are seventeen former GSC employees who resigned between January and July of 1994. Class Two plaintiffs are former GSC employees who were laid off on or about February 22, 1994, and who were not given WARN notice. Class Three consists of former GSC employees who were laid off on or about January 14, 1994, and who were not given WARN notice.

Class One and Class Two plaintiffs claim they are entitled to vested severance pay earned pursuant to a severance plan initially

---

1. The Worker Adjustment and Retraining Notifi- cation Act ("WARN") is discussed below at III.E.

established by Infotron ("the Manual plan"), as set forth in an Infotron managers' personnel manual, and maintained by GSC until February 17, 1994, when GSC announced a modified severance pay plan. Specifically, Subclass "A" plaintiffs received no severance pay. They maintain they are entitled to severance pay according to the terms of the Manual policy because their resignations were involuntary. The rest of the Class One and all Class Two plaintiffs received severance pay according to the terms of the modified plan. They claim they are entitled to severance pay according to the terms of the Manual plan. Class One and Class Two plaintiffs also seek to void GSC's severance plan modification, claiming it was implemented improperly. The individual plaintiffs, and all plaintiffs in Civil Action No. 95–4808, have brought claims of equitable estoppel based on alleged false representations made to them to the effect that the Manual plan would not be changed.

Class Two and Class Three plaintiffs also allege that defendants violated the Worker Adjustment and Retraining Notification Act, 29 U.S.C.A. §§ 2101–2107 ("WARN"), by terminating their employment without providing sixty-days' notice.

### C. *Factual History*

In or around 1984, Infotron developed a personnel policy and procedures manual entitled "Personnel Guidelines for the Manager" ("the Manual"). The Manual was kept in Infotron's Human Resources Department and was distributed to Infotron management employees for reference in handling day to day employee issues and questions. The introduction to the Manual states in pertinent part:

> This manual is designed to be an overall guide for supervisory personnel in their day-to-day administration. Additions, revisions and deletions will be issued from time to time. . . . Provisions of these guidelines are not to be considered policies binding on Infotron. They may be changed at any time as management deems appropriate. They are not intended to and do not constitute expressed or implied contractual obligations to anyone.

Section 2, Guideline 2–5 of the Manual—entitled "Termination"—sets forth in desultory fashion a policy on resignation, discharge and severance pay. The Manual provides in pertinent part:

1.3.1 Voluntary Resignation

Voluntary resignation is initiated by the employee. Employees other than managers and directors are expected to give at least two weeks' notice of resignation; . . . . Severance pay is not given in cases of voluntary resignation.

1.3.2 Involuntary Resignation

. . . if the resignation is *requested* by the company for other than misconduct or cause:

— non-exempt = one week's pay for each full year of employment

— exempt = two weeks' pay for each full year of employment

— officers = three weeks' pay for each full year of employment . . .

1.3.3 Discharge

Discharge is initiated by the Company. . . .

1.3.4 Severance Allowance

The purpose of severance allowance is to provide an employee with income during a period of financial adjustment precipitated by the Company's termination of his/her employment.

Under no circumstances will severance allowance be paid in cases of discharge for misconduct (i.e., insubordination, embezzlement, misappropriation of funds, misrepresentation, etc.).

It is undisputed that rank and file employees were generally familiar with the Manual plan, though they were not given copies of the Manual. How they came to be familiar with the Manual plan, whether they knew it was housed in written form in the Manual or elsewhere, and to what extent, if at all, they understood the Plan's details and were aware of the Manual's contractual disclaimer and reservation of rights clause, are all much foggier matters. The evidence suggests some employees may have known of the Manual plan *qua* Manual plan, while other employees' acquaintance with the Manual plan seems to have been formed exclusively

through their observations of how laid off employees were treated (in layoffs prior to and after the 1991 merger), their discussions with co-workers, and their informal and formal meetings with managerial/supervisory personnel. Whether all of GSC's managerial personnel were familiar with the Manual's contractual disclaimer and reservation of rights clause also is unclear.

During the late Spring and Summer of 1991, when the Infotron/GDI merger was in the works, Infotron and GTI officers conducted informational meetings with Infotron employees in Cherry Hill. Des Cunningham, then Chairman of the Board of GTI, stated at one such meeting that the merger would not result in either company's severance pay policy being changed, at least not for the worse.[2]

Subsequent to the merger, in August, 1991, and continuing through 1993, GSC conducted a number of layoffs. Affected employees apparently received severance pay pursuant to the Manual plan. Remaining employees became increasingly anxious about layoffs and about whether GSC would continue to provide the severance pay previously laid-off employees had received. They were told in the aftermath of layoffs—particularly in mid-January of 1994—that severance benefits were the same and/or that severance benefits were not going to change and/or that there were no plans to change severance benefits.[3]

GSC was expecting weak third quarter financial results in late 1993, and, as early as December, 1993, defendants' objective was to develop a restructuring plan which would entail layoffs. On January 6, 1994, GTI Director of Human Resources Jeffrey Singer ("Singer") and GTI President and Chief Executive Officer Brian Hedges ("Hedges")

traveled to Cherry Hill to prepare a layoff plan. At a January 7, 1994, meeting, GSC Director of Human Resources Vincent Messina ("Messina") showed the Manual containing the Manual plan to Singer and Hedges after having been asked either whether there was such a plan or whether he had a copy of Infotron's plan that he could show to them. (Messina Dep. at 118, 122). Hedges then spoke to the issue of severance pay, saying that "it was too rich" and expressing "surprise." (*Id.* at 123). Singer told Messina that he first was made aware of the Manual plan in a January, 1994, meeting. (*Id.* at 117). Singer turned a copy of the Manual over to GSC's legal counsel in late January, 1994, for review and for advice regarding the law governing severance plans. Singer knew at this time that workforce reductions and layoffs above and beyond those taking place in January, 1994, would be necessary. (Singer Dep. at 78).

On January 13, 1994, at a meeting of the GTI Board of Directors ("the Board"), Hedges directed GTI management to evaluate options for stemming the decline in revenue and profits, and to present their recommendations at the February 10, 1994, Board meeting. The Board understood as of the January 13, 1994, meeting that restructuring measures stronger than the planned January 14, 1997 layoffs would be required. On January 24 and 25, 1994, at meetings of the GTI Operations Committee, GTI and GSC managers were made aware of poor third-quarter results for both GTI and GSC. (Plaintiffs' Exh. 67 at 1). Defendants claim, although the evidence on this point is vague, that these third-quarter results were considerably worse than had been anticipated. Hedges requested that the Operations Committee

---

**2.** *See* Axelrod Dep. at 20–21; Barbato Dep. at 36; Booth Dep. at 9; Bracalante Dep. at 55; Egerton Dep. at 15–17; Evans Dep. at 11; Ford Dep. at 11; Frietter Dep. at 9; Gildersleeve Dep. at 12; Hannigan Dep. at 23–24; Karch Dep. at 30; LeFevre Dep. at 45; Nguyen Dep. at 18–20; O'Hara Dep. at 17; Patel Dep. at 29; Perrone Dep. at 40; Rollo Dep. at 57; Scassero Dep. at 12–13; Szumowski Dep. at 13–14.

**3.** *See* Axelrod Dep. at 33; Booth Dep. at 14; DeMarco Dep. at 10; Egerton Dep. at 22; Evans Dep. at 14–15; Feizet Dep. at 27; Gildersleeve

Dep. at 22–23; Harbaugh Dep. at 29; Kennedy Dep. at 11–13; LeFevre Dep. at 45–46; Luong Dep. at 16–17; Merlino Dep. at 13; Nguyen Dep. at 20–22; Patel Dep. at 13–14; Petrick Dep. at 12; Probasco Dep. at 27–29; Rollo Dep. at 55; Rose Dep. at 31–34; Roselli, Dep. at 30–31; Scassero Dep. at 17–20; Szumowski Dep. at 15–17.

According to plaintiffs' deposition testimony, employees were *not* told, as defendants would have it, simply that the managers were not aware of any such plans.

prepare an acceptable business case scenario for presentation at the scheduled February 10, 1994 Board meeting; he stressed the importance of downsizing without causing further revenue erosion. (*Id.* at 3).

Some time between January 21, 1994, and January 25, 1994, defendants formed an intent to modify the Manual plan. (Singer Dep. at 73, 75). The actual decision to modify the Manual plan was made by Hedges. (*Id.* at 75). Prior to February 8, 1994, Singer prepared materials concerning possible changes in severance benefits for presentation to the operating committee. (*Id.* at 135–38). On February 8, 1994, GSC issued a memorandum and attachment to all GSC employees concerning their benefits. This release consisted of a reissuance of an existing list of benefits—which list did not include any mention of severance pay—with a statement that GSC could amend, modify or terminate any benefits—whether listed or not listed—at any time, within the discretion of the President and CEO (then Frank Jerd). (Plaintiffs' Exh. 34). Between February 16 and 21, Singer was provided with a plan for the February 22, 1994, layoffs so that he could run a cost analysis. (Singer Dep. at 168). On February 17, 1994, GSC announced the modified severance plan pursuant to which laid off employees would receive one week's pay for each full year of employment *to a maximum of six weeks or $10,000,* whichever was less. (Plaintiffs' Exh. 47).

According to defendants, on January 14, 1994, GSC laid off thirty-eight full-time employees from the engineering and manufacturing groups at Cherry Hill, converted two of those employees—Michael Boyle and Patrick Countey—to contractor status, and laid off one part-time temporary employee—Amy Sinka. (Aff. of Procida at ¶ 5 & Exh. B). Plaintiffs contend that on January 14, 1997, or shortly thereafter, GSC laid off forty full-time employees, plus two part-time temporary employees—John Hembrough ("Hembrough") and Amy Sinka. (*See* Plaintiffs' Statement of Facts at ¶ 39). It is undisputed

that these employees received severance pay pursuant to the Manual plan terms.

According to defendants, on or about February 22, 1994, twenty-two employees were laid off immediately from the Cherry Hill facility. Hembrough and Jerd were terminated on February 4, 1994, and February 24, 1994, respectively. Part-time employee Christine Gorenstein was terminated on February 18, 1994. (Aff. of Procida at ¶ 7 & Exh. B). Plaintiffs contend that twenty-four full-time employees and one part-time employee were laid off on or after February 22, 1994. (*See* Plaintiffs' Statement of Facts at ¶ 50).

On February 18, 1994, sixty-two employees were given letters providing notice of future layoffs at various dates on or after April 25, 1994. These employees also received notice of an anticipated plant closing to take place on or after April 25, 1994. On March 2, 1994, six employees received notices of layoff on May 2, 1994. Employees Patricia O'Hara and Michael Dombrosky were laid off without notice on March 7, 1994, and March 31, 1994, respectively. GSC terminated Denise Fidura and Stephen Egerton without notice on July 12, 1994, and July 18, 1994, respectively. Sandra LeFevre was laid off by GSC on June 3, 1994. All employees laid off after February 17, 1994, received severance pay pursuant to the modified plan.[4]

Between January 1, 1994, and August 31, 1994, thirty-eight GSC employees—including the seventeen Subclass "A" plaintiffs—at Cherry Hill resigned their employment at GSC. Only three of the Subclass "A" plaintiffs had received layoff notices prior to tendering their resignations. All Subclass "A" plaintiffs had engaged in job searches and obtained job offers from new employers prior to resigning from GSC, and none experienced any period of involuntary unemployment.

## II. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

4. A schedule showing the dates and numbers of layoffs is attached at the end of this Opinion as "Appendix A." An additional schedule, annotated to clarify the parties' factual disagreements, is attached as "Appendix B."

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The substantive law governing the dispute will determine which facts are material, and only disputes over those facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248. Where the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Idus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A genuine issue for trial does not exist "unless the party opposing the motion can adduce evidence which, when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor." *J.E. Mamiye & Sons, Inc. v. Fidelity Bank,* 813 F.2d 610, 618 (3d Cir.1987) (Becker, J., concurring). If the non-moving party's evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Bixler v. Central Pa. Teamsters Health & Welfare Fund,* 12 F.3d 1292 (3d Cir.1993); *Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs,* 982 F.2d 884, 890–91 (3d Cir.1992).

## III. DISCUSSION

### A. Standing

■ Defendants argue that Class One plaintiffs and Class Two plaintiffs lack standing to bring this action under the Employee Retirement Income Security Act ("ERISA").

"ERISA is a comprehensive statute enacted to promote the interests of employees and their beneficiaries in employee benefit plans, ... and to protect contractually defined benefits[] ...." *In re Unisys Corp. Retiree Medical Benefit "ERISA" Lit.,* 58 F.3d 896, 901 (3d Cir.1995) (internal quotes and citations omitted). The statute covers two types of employee benefit plans: pension plans and welfare plans. 29 U.S.C.A. § 1002(3) (West 1985). ERISA provides that a civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of a plan, to enforce his rights under a plan, or to clarify his rights to future benefits under a plan. *Id.* § 1132(a). ERISA defines "participant" as:

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

*Id.* § 1002(7).

The Supreme Court has construed "participant" as it is defined in ERISA:

> [T]he term "participant" is naturally read to mean either "employees in, or reasonably expected to be in, currently covered employment," ... or former employees who "have ... a reasonable expectation of returning to covered employment" or who have "a colorable claim" to vested benefits[.] In order to establish that he or she "may become eligible" for benefits, a claimant must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future.

*Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 117–18, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (citations omitted) (second alteration in original); *see Shawley v. Bethlehem Steel Corp.,* 989 F.2d 652, 655–56 (3d Cir. 1993). Whether plaintiffs are plan participants is determined as of the time they file the lawsuit. *Curtis v. Nevada Bonding*

*Corp.*, 53 F.3d 1023, 1027 (9th Cir.1995); *Raymond v. Mobil Oil Corp.*, 983 F.2d 1528, 1534–35 (10th Cir.), *cert. denied,* 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993).

Because plaintiffs are not former employees with a reasonable expectation of returning to covered employment, they cannot be deemed "participants" entitled to maintain this action unless they have a colorable claim to vested benefits. "The requirement of a colorable claim is not a stringent one.... [O]nly if 'any claim ... must be frivolous is jurisdiction lacking.'" *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 790 (7th Cir.1996) (quoting *Kennedy v. Connecticut General Life Ins. Co.*, 924 F.2d 698, 700 (7th Cir.1991)) (second alteration in original); *see Abraham v. Exxon Corp.*, 85 F.3d 1126, 1129 (5th Cir.1996) (test is not actual entitlement to benefits, it is whether plaintiff has colorable claim that she will prevail). "*Firestone* did not 'reduce the standing question to a straightforward formula applicable to all cases.'" *Shawley,* 989 F.2d at 658 (quoting *Christopher v. Mobil Oil Corp.*, 950 F.2d 1209, 1221 (5th Cir.), *cert. denied,* 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992)). Rather, the definition of "participant"

> 'must be read in the context of traditional concepts of standing, not in the context of adjudicating the ultimate issue of the merits of plaintiffs' claim that they are not receiving the full extent of the benefits to which they are entitled .... Standing focuses on a person's effort to get his complaint before a court and not on the issue he wishes to have adjudicated.'

*Astor v. International Bus. Machines Corp.*, 7 F.3d 533, 538 (6th Cir.1993) (quoting *Hughes v. General Motors Corp.*, 852 F.2d 568, 1988 WL 72742 (6th Cir.1988), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1535, 103 L.Ed.2d 839 (1989), (unpublished)) (citations omitted).

With respect to Class One plaintiffs and Class Two plaintiffs, defendants' argument that plaintiffs lack standing simply is without merit. These plaintiffs claim defendants abrogated vested rights they obtained through contract and/or by estoppel. They also challenge the validity of the severance plan modification used to deny them benefits to which they claim they had vested rights. Their federal common law unilateral contract and estoppel theories have been recognized in Third Circuit ERISA cases. (*See infra,* Part III.B., C.). Their claims are neither frivolous nor patently implausible. These plaintiffs have colorable claims to vested benefits and therefore have standing.

■ Subclass "A" plaintiffs, however, are in a different position because they resigned. GSC's severance plan, whether—for purposes of this analysis—located in the Manual or in oral representations, extended severance benefits only to those workers whose terminations were involuntary. Subclass "A" plaintiffs can have no colorable claim to vested benefits unless they resigned involuntarily or were discharged for reasons other than misconduct. Subclass "A" plaintiffs contend they were constructively discharged and that their resignations therefore were involuntary.[5] This Court does not agree.

To some extent the parties have characterized the dispute as whether the doctrine of constructive discharge should operate here. This characterization is slightly misleading. The doctrine first appeared in actions arising under the National Labor Relations Act where plaintiffs seek to show that they were discharged because of union membership or union activities. *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir.1984) (citing cases). It was exported to Title VII cases where plaintiffs endeavor to establish that they were discharged because of their membership in a protected class. *Id.* at 887–88. The doctrine has been applied in ERISA cases where plaintiffs claim that they were discharged because they sought to exercise their rights under a covered plan in violation of ERISA. *See, e.g., Berger v. Edgewater Steel Co.*, 911 F.2d 911, 923 (3d Cir.1990), *cert. denied,* 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); *Gehin–Scott v. Newson,*

---

**5.** Plaintiffs employ the terms "constructive discharge" and "involuntary resignation" interchangeably. (*See* Second Amended Complaint (No. 96–0621(JEI)) at ¶¶ 14, 16, 48, 49; Plaintiffs' Mem. In Opp. to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross–Motion at 25–29).

*Inc.,* 848 F.Supp. 585, 588 & n. 2 (E.D.Pa.), *aff'd,* 40 F.3d 1240 (3d Cir.1994). In each of these contexts the issue is whether an employer has done indirectly what she may not do directly by knowingly permitting conditions in employment " 'so intolerable that a reasonable person subject to them would resign.' " *Berger,* 911 F.2d at 923 (quoting *Goss,* 747 F.2d at 888); *see Clowes v. Allegheny Valley Hosp.,* 991 F.2d 1159, 1161 (3d Cir.), *cert. denied,* 510 U.S. 964, 114 S.Ct. 441, 126 L.Ed.2d 374 (1993); *Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1079 (3d Cir.1992); *Schafer v. Board of Pub. Educ.,* 903 F.2d 243, 248–49 (3d Cir.1990); *Gehin-Scott,* 848 F.Supp. at 588 & n. 2.

Subclass "A" plaintiffs do not claim they were constructively discharged in violation of § 510 of ERISA, 29 U.S.C.A. § 1140.[6] That is, they do not allege that defendants constructively discharged them in order to avoid having to give them severance allowances. They simply claim that their resignations were "involuntary" within the meaning of the terms of the severance plan.

 After reviewing the evidence, this Court is satisfied there is no dispute that Subclass "A" plaintiffs understood that severance was reserved for those who were laid off or otherwise involuntarily terminated. As an initial matter, it should be noted that the fact of Subclass "A" plaintiffs experiencing no period of unemployment does not doom their claim. Employees may be entitled to severance benefits notwithstanding they did not experience a period of unemployment; eligibility depends upon the plan terms. *See, e.g., Weir v. Federal Asset Disposition Ass'n,* 123 F.3d 281, 287 (5th Cir. 1997); *Bellino v. Schlumberger Tech., Inc.,* 944 F.2d 26, 31 (1st Cir.1991). This Court finds no requirement, expressed in either written or oral representations concerning the severance plan, that a terminated employee must experience a period of unemployment in order to be entitled to severance pay. What does doom plaintiffs' claim is that it is neither reasonable, credible nor sound policy to read severance plans such as defen-dants' as dictating that employees are "constructively discharged" when a company experiencing difficult financial times cuts back personnel benefits (e.g., severance pay) which it believes it has the right to scale back.

The only reasonable interpretation of the plan is that GSC was promising severance pay to employees who left employment when GSC wanted them to leave, that is, who left on GSC's terms. This Court does agree with the parties that if GSC knowingly permitted employment conditions to exist which no reasonable employee could have been expected to tolerate, then GSC fairly could be said constructively to have forced employees to leave on its terms, and plaintiffs' claim might survive. But GSC did not knowingly permit such conditions to exist.

The employment conditions faced by Subclass "A" plaintiffs varied. One Subclass "A" plaintiff resigned on January 14, 1994, without having received a layoff notice and prior to GSC's announcement that benefits could change. Thirteen Subclass "A" plaintiffs resigned after the severance plan modification was announced but prior to receiving layoff notices. Three Subclass "A" plaintiffs resigned after the Manual plan was modified and after receiving notice of future layoffs. This Court need not parse the qualitative differences between the working conditions these various Subclass "A" plaintiffs faced because even the worst of these conditions would not, and in fact did not, induce all reasonable plan participants to resign. Indeed, all but one of the Subclass "A" plaintiffs continued working for weeks beyond: (1) the January 14, 1994, layoffs; (2) the February 8 memorandum stating that GSC could amend its benefits plan; (3) the February 17 announcement of the reduction in severance pay; (4) the February 22 layoffs; (5) the February 22 layoff notices; (6) the February 22 plant closing announcement; and (7) the March 2 layoff notices.

In sum, it is an unreasonable interpretation of the Manual plan to say that a severance pay cutback (even if it proves to have

---

6. This section provides in pertinent part that "[i]t shall be unlawful for any person to discharge ... a participant ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan ...."

been unlawful), in tandem with the imminence of layoffs, should be regarded as forcing all reasonable employee to resign or otherwise constructively terminating their employment.[7] Subclass "A" plaintiffs' own testimony is substantially in accord with this Court's analysis and conclusion. Their contemporaneous understandings were that they were leaving voluntarily and were not entitled to severance pay under GSC policy and practice.[8]

Subclass "A" plaintiffs left on their own terms, not on GSC's. They chose thereby to forego severance pay. They do not have a colorable claim to benefits and are not plan "participants." Therefore, they lack standing. Cf. Sallee v. Rexnord Corp., 985 F.2d 927, 928–29 (7th Cir.1993) (no colorable claim where plaintiffs elected to resign and policy provided that employees would get severance only if they stayed until actual termination date); Bartman v. Allis–Chalmers Corp., 799 F.2d 311; 314–15 (7th Cir.1986), cert. denied, 479 U.S. 1092, 107 S.Ct. 1304, 94 L.Ed.2d 160 (1987), (employees who resigned for fear of

having no pension benefits if they resigned during window of time between expiration of old contract and signing of new one were not constructively discharged absent showing that employer delayed contract process in order to induce retirements).[9] Accordingly, Subclass "A" plaintiffs' complaint will be dismissed.[10]

### B. Vested Severance Benefits Claim

Class One and Class Two plaintiffs claim they are entitled to vested severance pay. Defendants deny that any plaintiffs earned vested severance pay.

"ERISA's coverage extends broadly to include all employee benefit plans." In re New Valley Corp., 89 F.3d 143, 148 (3d Cir. 1996), cert. denied, —— U.S. ——, 117 S.Ct. 947, 136 L.Ed.2d 835 (1997). An employee benefits plan may be either an "employee welfare benefit plan" or an "employee pension benefit plan." 29 U.S.C.A. § 1002(3) (1985).[11] Almost all severance policies are

---

7. Subclass "A" plaintiffs make much of the fact that some members of GSC management anticipated that some employees would leave rather than wait for their layoffs and their reduced severance pay. This fact tends to show that subclass "A" plaintiffs' decisions were reasonable, not that no reasonable persons could be expected to tolerate the working conditions at GSC.

Only one case cited by subclass "A" plaintiffs tends to provide any support for their position. In Anthony v. Jersey Central Power & Light Co., 51 N.J.Super. 139, 143 A.2d 762 (1958), an employee was told that he could stay with the defendant employer only if he accepted a serious demotion in position and salary. The court reasoned that the employee's refusal of this offer could not be regarded as resignation within the fair meaning of a severance pay provision that denied such pay to those who resigned. Id. 143 A.2d at 767. Anthony supports the proposition that where an employee's job is eliminated and he refuses to accept an offer of a new job, he might be said to have been discharged constructively. That proposition does nothing for plaintiffs here.

8. See Barbarito Dep. at 25–26; Bentzley Dep. at 68; Bracalente Dep. at 16–17; Brown Dep. at 24; Carey Dep. at 55–56; DiMatteo Dep. at 36; Hannigan Dep. at 18; Hughes Dep. at 34; Kennedy Dep. at 10; Nicolazzo Dep. at 50–51; Nolte Dep. at 42–43; Ramsell Dep. at 30, 32; Trautwein Dep. at 44; Traynor Dep. at 52.

9. In some circumstances former employees may have standing because but-for their employer's

violation of ERISA they would have been plan participants. See Swinney v. General Motors Corp., 46 F.3d 512 (6th Cir.1995); Shawley v. Bethlehem Steel Corp., 989 F.2d 652 (3d Cir. 1993); Berger v. Edgewater Steel Co., 911 F.2d 911 (3d Cir.1990), cert. denied, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991); Christopher v. Mobil Oil Corp., 950 F.2d 1209 (5th Cir.1992). But see Raymond v. Mobil Oil Corp., 983 F.2d 1528 (10th Cir.), cert. denied, 510 U.S. 822, 114 S.Ct. 81, 126 L.Ed.2d 49 (1993); Stanton v. Gulf Oil Corp., 792 F.2d 432 (4th Cir.1986). Plaintiffs do not advance this claim. They probably would not prevail if they did. A showing of standing on the but-for theory here would be a showing of involuntary resignation or constructive discharge. Since there is no such resignation or discharge here, the but-for doctrine would not apply. See Berger, 911 F.2d at 922.

10. Subclass "A" plaintiffs have not asserted a WARN claim. Therefore, dismissal of their ERISA claims results in their dismissal from this action altogether.

11. "Employee welfare benefit plan" is defined as any plan, fund or program which was heretofore or is hereafter established or maintained by an employer ... to the extent that such plan, fund or program was established or is maintained for the purpose of providing for its participants ... (A) ... benefits in the event of ... unemployment ... or (B) any benefit described in [29 U.S.C.A.] section 186(c) of [the Labor Management Relations Act of 1947]

ERISA-covered welfare benefit plans as they are included by reference in ERISA's definition of "employee welfare benefit plan." *See generally Massachusetts v. Morash*, 490 U.S. 107, 116, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989); *Schonholz v. Long Island Jewish Medical Center*, 87 F.3d 72, 75 (2d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996); Mark Daniels, *The Regulation of Severance Plans Under ERISA*, 12 Indus. Rel. L.J. 340, 343 (1990). This Court has no difficulty finding that the severance plan here is an ERISA-covered welfare benefit plan.

■ While pension plans are subject to ERISA's detailed participation, vesting and minimum funding requirements, welfare plans explicitly are exempted from these substantive requirements. 29 U.S.C.A. §§ 1051, 1081; *see Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *In re Unisys Corp. Retiree Med. Benefit "ERISA" Lit.*, 58 F.3d 896, 901 (3d Cir.1995); *Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1160 (3d Cir.1990). Thus, "ERISA does not require automatic vesting of welfare benefit plans." *Unisys*, 58 F.3d at 901. As Judge Easterbrook recently stated the matter: "[p]ensions vest by law" while "welfare benefits are left to contract." *Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 616 (7th Cir.) (en banc) (Easterbrook, J., dissenting), *cert. denied*, 510 U.S. 909, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). As a general rule, welfare plans such as severance plans may be freely amended or canceled at any time. *See, e.g., Curtiss–Wright*, 514 U.S. at 78.

Plaintiffs do not disagree that GSC's plan could be freely modified or canceled at any time. Nor do they argue that the right to modify or cancel the plan was required to be reserved explicitly by defendants. Plaintiffs' claim is that GSC employees earned vested contractual rights to receive 1–3 weeks' pay as severance for each year they worked prior to defendants' February 17, 1994, modification of the Manual plan. They allege that

GSC offered to give its employees—in the event their employment was terminated for reasons other than misconduct—1–3 weeks' pay for each year of work they performed in exchange for employees' continued work at GSC. A contract was formed when employees accepted the alleged offer by continuing to work for GSC. Because employees accepted GSC's offer by performance instead of by return promise, the contract formed was a unilateral contract. Plaintiffs argue that GSC's duty to perform—that is, its duty to pay employees 1–3 weeks' pay for each year of work completed—would be (and was) triggered when employees were laid off.

■ It is well-settled that nothing in ERISA prevents an employer from providing vested employee welfare benefits by contract. *See Inter–Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.*, 520 U.S. 510, ——, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997) (recognizing that employer may "contractually cede[] its freedom" to adopt, modify or terminate benefits plan); *Schonholz*, 87 F.3d at 77 (employer may contract to vest benefits); *Unisys*, 58 F.3d at 902 ("welfare plan may provide a vested benefit" if employer intended vesting); *Bidlack*, 993 F.2d at 604 (same); *id.* at 616 (Easterbrook, J., dissenting); *Anderson v. John Morrell & Co.*, 830 F.2d 872, 876–77 (8th Cir.1987) (parties may set out by agreement whether benefits vest); *In re White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986) (same).

■ In the Third Circuit, employees have relied successfully on such unilateral contract principles to show that they had vested benefits in cases involving ERISA plans. As far as this Court is aware, however, plaintiffs are the first litigants to invoke such principles in a case involving an ERISA-covered severance plan. This Court begins by considering the basic question of whether severance plans can be unilateral contracts and concludes without difficulty that they can.

In *Kemmerer v. ICI Americas Inc.*, 70 F.3d 281 (3rd Cir.1995), *cert. denied*, 517

---

29 U.S.C.A. § 1002(1). An "employee pension benefit plan," in contrast, is

 any plan, fund, or program which was heretofore or *is* hereafter established or maintained

by an employer ... to the extent that by its express terms ... such plan ... (i) provides retirement income to employees ....

29 U.S.C.A. § 1002(2).

U.S. 1209, 116 S.Ct. 1826, 134 L.Ed.2d 931 (1996), the Third Circuit explained:

> As we pointed out in [*Barrowclough v. Kidder, Peabody & Co.*, 752 F.2d 923 (3d Cir.1985)], "this court has repeatedly considered claims for benefits by participants ... that are based on the terms of or rights under a plan" even though such claims are based not on fiduciary duties but on "breach[es] of contract of an employee benefit plan." *Id.* at 935–36. Thus, in such instances, breach of contract principles, applied as a matter of federal common law, govern disputes arising out of the plan documents.

70 F.3d at 287.

The Third Circuit has had no difficulty recognizing pension plans and Top Hat plans [12] as unilateral contracts in cases where plan participants allege that their employer breached such contracts. *See In re New Valley*, 89 F.3d 143 (3d Cir.1996); *Kemmerer*, 70 F.3d 281. The Third Circuit held in *Kemmerer* that while a unilateral contract such as a Top Hat plan may be canceled at any time—such that going forward an employee no longer will be earning deferred income—the employer legally cannot refuse to perform under the terms of the Top Hat plan prior to its cancellation once an employee has performed. 70 F.3d at 287–88.

The court's reasoning can be captured in a simple illustration. If an employee is promised $10 per hour effective Monday, and told that her wage can be reduced at any time, and on Wednesday her wage is cut to $5 effective Thursday, her employer cannot refuse on pay day to give her $10 per hour for her work on Monday through Wednesday. Far from requiring that the employer express an explicit intent to pay $10 per hour for Monday through Wednesday's work notwithstanding the employer's freedom to reduce wages at any time, the Third Circuit held that what would have to be preserved explicitly would be an employer's right to apply the reduced wage *retroactively* to Monday through Wednesday's work. *See Kemmerer*, 70 F.3d at 287 ("[E]ven when a plan

reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes that door under unilateral contract principles (unless an explicit right to terminate or amend after the participants' performance is reserved."). A contrary rule would lack any basis in contract law and would render the employer's promise under the unilateral contract wholly illusory.) *Id.* at 287–88; *accord Kulins v. Malco, a Microdot Company, Inc.*, 121 Ill.App.3d 520, 76 Ill.Dec. 903, 459 N.E.2d 1038 (1984) (severance pay).

*In re New Valley*, 89 F.3d 143 (3d Cir. 1996), added to the law in this area by holding that, because Top Hat plans are *not* required by ERISA to be in writing, where Top Hat plan participants claim rights to vested benefits pursuant to a unilateral contract despite contrary plan language, the rule that the four corners of the written plan document(s) must control does not apply, and normal federal common law rules of contract interpretation are to be employed. 89 F.3d at 153.

This Court sees no reason why severance plans may not be recognized as being unilateral contracts in ERISA cases. Severance plans adopted to encourage employees to stay with their employer, and severance plans awarding severance based on length of service, are unilateral contracts, regardless of whether they are the product of negotiations between employer and employees. *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1232 (3d Cir.1991) (ERISA case); *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134, 147 (3d Cir.1987), *aff'd in part, rev'd in part on other grounds*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (same); *see also Taylor*, 933 F.2d at 1232 ("Severance plans are often similar to employment contracts, whose interpretation requires determining the intent of both contracting parties.").

There are differences between pension plans and severance plans. The key differences between (most) severance policies and pension plans or Top Hat plans is that sever-

---

**12.** "A top hat plan is a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly trained employees." *In re New Valley*, 89 F.3d at 148.

ance pay is not really deferred compensation and an employee's right to receive it is contingent upon her being terminated (that is, it does not flow simply from retirement or resignation). But these differences are not material here. During the life of a unilateral severance pay contract such as the one alleged to exist here, an employee earns the right to receive one week's pay per year worked in the event she is terminated. Her rights to receive severance pay under this formula vest as she works. If the severance contract is canceled by her employer pursuant to a reservation of rights clause, then the employee ceases earning rights to one week's pay per year worked (subsequent to that contract cancellation) in the event she is terminated. But if she is terminated, her employer's duty to perform (i.e., its duty to pay her one week's pay per year worked prior to the contract's cancellation) is triggered and its failure to do so is a breach of contract.

Of course to say that there can be unilateral contracts for severance pay and to explain how they operate is not to say that there was one here. Indeed, defendants' claim is that there was no such unilateral contract here. In their view, the written Manual plan represents not a unilateral severance pay contract, but a gratuitous promise to pay severance enforceable under ERISA as long as the

promise is in effect, a reservation of the right to revoke or modify the promise, along with a description of how severance will be calculated in the event that the promise has not been revoked or modified.[13]

This Court will not attempt to iron out the conceptual complexity of ERISA's relationship with contract principles that lurks beneath the parties' dispute in this case. It suffices to say this Court is satisfied that if plaintiffs entered into a unilateral contract with defendants of the type they describe, then they are entitled to receive the severance pay they earned under that contract. As in any other type of contractual dispute, however, in order to survive summary judgment plaintiffs must show there is a genuine issue of fact as to the existence of the contract they allege. Defendants, in turn, in order to survive the cross-motion for summary judgment, similarly must show there is a genuine issue of fact.

The crucial antecedent issue of law that must be resolved concerns where the parties can and/or must look for evidence as they endeavor to carry their burdens at the summary judgment stage. Defendants contend that the relevant search in this case—whether it be styled a search for a unilateral

---

**13.** It is hard to see why, under defendants' view of the policy, GSC was not free to cancel its severance policy and deny severance pay *even after terminating employees*. After all, the policy contains a disclaimer of contractual intent and reserves to GSC the right to terminate it "at any time." Thus, under defendants' view, the benefits promised to be delivered upon termination cannot be "vested." If the policy is not a contract at all, but rather is just a gratuitous promise, and ERISA protects "contractually defined benefits," it is not clear why ERISA ever could be invoked to enforce the promise on contractual grounds. Instead, it would appear that plaintiffs would be limited to an estoppel theory under which they would argue that—the disclaimer notwithstanding—it was reasonable to believe they would get severance pay if the policy had not been changed before they were terminated. Their damages, however, for reasons mentioned below, would be limited to the detrimental harm caused by their reliance, and might fall far short of what they were expecting to receive as severance.

Perhaps defendants would say plaintiffs would be able to recover the withheld benefits because the benefits would be "due ... under the terms

of [the] plan," 29 U.S.C.A. § 1132(a)(1)(B). Apart from begging the question, this approach would raise another problem. For as s defendants have pointed out with vigor, ERISA's enforcement provision allows plan participants to bring an enforcement action for benefits due only if they have a colorable claim to "vested benefits."

One might be tempted to argue that a court would not construe the plan in such a way as to allow defendants to withhold severance upon an employee's termination even though the plan was still in place because to do so would suggest that the plan contained an illusory promise. But, as defendants argue implicitly throughout their submissions, ERISA does not proscribe illusory promises.

Finally, one might argue that the plan should not be interpreted as making only an illusory promise because no reasonable party in the employees' position would bargain for an illusory promise. Under defendants view, of course, that objection must collapse upon itself because the point of departure for the inquiry is precisely the claim that no bargaining, let alone contracting, ever took place.

contract or a search for vested severance benefits—must look to and be confined by the written plan documents. They rely on the rule that "extra-ERISA commitments ... must be found in the plan documents and stated in clear and express language." *Unisys,* 58 F.3d at 902; *see Schonholz,* 87 F.3d at 78 ("Courts that have allowed contractual vesting have required, at a minimum, that the employer's intent to vest the benefits be contained in a written document.").

This rule flows from the rule that "[ERISA] plan documents control and cannot be modified or superseded by the employer's oral undertakings." *Unisys,* 58 F.3d at 902; *see In re New Valley,* 89 F.3d at 149; *Hozier v. Midwest Fasteners, Inc.,* 908 F.2d 1155, 1164 (3d Cir.1990); *see also In re Unisys,* 58 F.3d at 906 n. 16 (referencing "Congress' intent that plan documents and SPDs exclusively govern an employer's obligations with respect to an ERISA plan"). As the Third Circuit recently stated: "Like any common law integration clause, § 1102(a)(1) makes the plan document the entire agreement of the parties and bars the introduction of parol evidence to vary or contradict the written terms." *In re New Valley,* 89 F.3d at 149.

At first glance, in light of the rule that the terms in the written plan documents must control, defendants appear to have an open and shut case. Besides reserving to defendants the right to change Manual provisions at any time as they deem appropriate, the written Manual policy explicitly states that "[p]rovisions of these guidelines are not to be considered policies binding on Infotron ... They are not intended to and do not constitute expressed or implied contractual obligations to anyone." It is "Contracts I" that there can be no contract where one allegedly contracting party overtly manifests an intent not to be bound.

The evidence in this case, however, is that few plaintiffs, if any, ever were shown the actual written Manual plan or informed of its existence. Plaintiffs were made aware of defendants' severance plan not by a plan document or summary plan documents, but rather by observation of defendants' practice and word of mouth, and, later, by defendants' statements at the time of layoffs to the effect that indeed there was such a plan. It is to these sources plaintiffs point in alleging defendants offered to enter into unilateral contracts with them.

To this Court's knowledge, the rule requiring that any intent to create contractually vested rights be contained in plan documents has not been applied in a case where an employer never disclosed such documents to plan participants or even advised them that such documents existed. *See Schonholz,* 87 F.3d at 78 ("In each case cited by [defendant] for the proposition that vesting must be included in formal plan documents, the employer had created such documents and distributed summary plan descriptions to its employees."); *cf. In re Unisys,* 58 F.3d at 900 (summary plan description booklet containing reservation of rights clause was distributed to all employees).

Applying the rule in cases like the instant one would have the effect of permitting employers to enter into contracts for vested benefits with employees and only to repudiate them later by coming forth with previously undisclosed plan documents disclaiming contractual intent on the employers' part. This Court simply cannot accept that a statute "enacted 'to protect contractually defined benefits,'" *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989) (quoting *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985)), must produce such an anomalous result.

Driving the rule that any contract for vested welfare benefits must be found in the plan document itself is the recognition of ERISA's writing requirement designed "to ensure that 'every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.'" *Hozier,* 908 F.2d at 1163 (quoting H. Rep. 93–1280, 2d Sess. 297, *reprinted in* U.S.C.C.A.N. 5038, 5077–78). "'Congress ... did not intend that participants in employee benefit plans should be left to the uncertainties of oral communications in finding out precisely what rights they were given under their plan.'" *Id.* at 1164 (quoting *Musto v. American Gen. Corp.,* 861 F.2d 897, 909–10 (6th Cir.1988), *cert. denied,* 490 U.S. 1020, 109

S.Ct. 1745, 104 L.Ed.2d 182 (1989)). Implicitly, then, the rule derives from ERISA's requirements that participants be furnished summary plan descriptions, 29 U.S.C.A. § 1021(a)(1) (West 1985), and that these descriptions "be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan," *id.* § 1022(a)(1). The policy purposes generally served by the rule that written plan documents control would be thwarted if employers were allowed, as a matter of law, to wriggle out of contractual commitments by failing to disclose plan documents. Further, on the level of basic contract law, allowing the written plan document to come into play here would make little sense. The search is for objective manifestations of contractual intent. To allow undisclosed disclaimers of intent to trump outward signs of intent, again under a statute designed to protect contractually defined benefits, would be absurd. It makes no sense to guarantee plan participants' rights to bring actions for breach of contract under ERISA, *see Kemmerer,* 70 F.3d at 287, while at the same time making such rights worthless in cases where employers violate ERISA's disclosure rules.

■ This Court concludes, therefore, that the rule requiring this Court to look for contractual intent in the written plan documents—and only there—does not control a case in which the employer never discloses, in violation of the law, the existence of a written plan document containing a disclaimer. It is not the fact of violation *qua* violation which prompts this decision, it is the fact of nondisclosure. The effect of this Court's approach is to advise employees that if they know a written plan exists, then it is incumbent upon them to ascertain their rights under that plan and *per se* unreasonable to rely on any oral representations at odds with its written terms. But if employees do not know that a written plan document exists, and they negotiate for contractually vested benefits, then the employer will not be able to repudiate the contract later by bringing to light a previously undisclosed contractual disclaimer.

Indirect support for this Court's approach is found in *New Valley* where the Third Circuit explained that since a Top Hat plan need not be in writing it is appropriate to look beyond its written terms to determine whether parties bargained for vested benefits and not just a gratuitous promise. While it is true that ERISA requires welfare benefit plans to be in writing, it is also well-settled that unwritten severance practices can be ERISA plans. *See Smith v. Hartford Ins. Group,* 6 F.3d 131, 136 (3d Cir.1993); *Payments to Departing Employees: Inadvertent Creation of an ERISA–Governed Severance Plan,* 3 No. 9 Emp. L. Strategist 1, 1 (1996). Here, as far as defendants represented to plaintiffs, the severance plan was constituted not by a written document, but by defendants' practice and oral representations. This Court finds it appropriate, as it was in *New Valley,* to look beyond written plan terms to extrinsic evidence of defendants' intent. *Cf. Schonholz,* 87 F.3d at 78 ("[A]ny agreement to vest [plaintiff's] benefits would only have to be memorialized at the same level of formality that [defendant] chose in promulgating the Severance Plan in the first place.").

This Court's approach also finds support in the Third Circuit's recognition of an equitable estoppel action under ERISA. Recognition of such an action must depend on a recognition that in some cases a reservation of rights clause and/or contractual disclaimer will not avail an employer where such benefit-qualifying language is never revealed to employees. If the rules requiring that contractual obligations be housed in plan documents and preventing oral modifications of written plan terms do not foreclose an equitable estoppel claim, it is unclear why in all instances they should foreclose a contract claim. The result in either case is that written disclaimers will not control participants' rights where such disclaimers are undisclosed.

■ The approach taken here violates none of ERISA's statutory provisions and, far from doing violence to some policy goal of ERISA, is consistent with ERISA's core aspiration of protecting contractually defined benefits. Further, it leaves undisturbed the

general proposition in welfare plan cases that where a plan document actually apprises employees of their employer's lack of intent to create vested rights, any contractual expectations they come to harbor in the face of such a written appraisal are *per se* unreasonable. Finally, it provides employers with an incentive to comply with ERISA's procedural and fiduciary provisions where they have reservation of rights clauses since, if they fail to comply and represent an intent to be bound, they may find they have ceded contractually their right to amend or terminate a plan.

Nothing in this Court's approach should be taken to suggest plaintiffs will have an easy time showing that defendants intended to provide contractually vested severance benefits. An employer does not, merely by telling employees they will receive a severance award and that it will be based on the number of years they worked, stumble into a binding unilateral contract under which rights vest. The discussion in *Anderson v. John Morrell & Co.*, 830 F.2d 872 (8th Cir. 1987), is illuminating. In *Anderson*, an employee who was promised orally that his fringe benefits would always be as good as those of employees in a bargaining unit argued that this offered promise resulted in a contract when he accepted it by working. The Eighth Circuit had this to say:

> The gist of Anderson's claim is that the employer's oral statement to individual employees of its "policy" became a contract to maintain and improve the plan when the employees thereafter performed service. Yet if that be so, it would equally follow that an employer's announcement of any plan to pay welfare benefits would become

a contract to maintain the plan indefinitely upon the performance of service by employees. Congress did not intend that result. Doubtless it is consistent with the intent of Congress for an employer to undertake such an obligation if it elects to do so. We conclude, however, that to accomplish that result, there must be a specific, if not written, expression of the employer's intent to be bound.

*Id.* at 877. Plaintiffs here will be required to demonstrate some "specific, if not written" expression of defendants' intent to be bound.

This Court concludes, then, that the defendants' inclusion of a contractual disclaimer and reservation of rights clause in the Manual does not entitle them to judgment as a matter of law on the First Count's unilateral contract claim. This Court also finds that genuine issues of material fact exist preventing this Court from granting either the motion or cross-motion for summary judgment. Drawing justifiable inferences from the evidence presented, a fact finder reasonably could conclude either: (1) there was a meeting of the minds between plaintiffs and defendants that if plaintiffs worked for GSC until they were terminated, then they would receive 1–3 weeks' pay as severance unless discharged for cause; or (2) there was merely a gratuitous promise made by defendants to provide terminated employees with a severance allowance in amounts based on employees' tenure.

Of course the recovery to which various plaintiffs may be entitled in the event they prevail on their contract claims may vary.[14]

---

14. For example, the nature of any recover by plaintiffs will depend upon the exact theory of benefit accrual posited by plaintiffs. Plaintiffs contract claim can be read in at least two ways. One reading is that, upon accepting defendants' alleged offer to contract, plaintiffs began to accrue one week's pay per year of service completed from the time of contracting. Thus a plaintiff who began "performing" in response to defendants' alleged offer on January 1, 1991, for example, would have accrued three weeks' severance pay as of January 1, 1994, and would not be entitled to one week's pay as severance for each year of work prior to January 1, 1991. Under this reading the time at which various plaintiffs' entries into unilateral contracts would control their recoveries.

Another reading is that, upon accepting defendants' alleged offer, plaintiffs' became entitled to one week's pay as severance for all of the previous years they had worked and any years they went on to work. Thus a plaintiff who began working on January 1, 1978, and who accepted defendants' alleged offer on January 1, 1991, for example, would be entitled to sixteen weeks' pay as severance as of that date. Plaintiffs' method of calculating the monies owing them suggests that this latter reading is the one they endorse. Under this reading it follows that if: (1) prior to January 1, 1994, defendants had no severance policy; (2) plaintiffs threatened to resign on January 2, 1994; (3) defendants' promised on January 3, 1994, to give plaintiffs one week's pay per year worked as severance if they would stay; (4)

Hearings may be necessary to determine individual plaintiffs' circumstances. Specifically, while some plaintiffs may have had representations made to them which a fact finder reasonably could find manifested an intent to contract on the part of defendants, others may not. Additionally, some plaintiffs may have been aware of the written contractual disclaimer, or understood from the outset of their relationship with defendants that the latter's offer of severance was merely a retractable promise to pay severance with an explanation of how it would be computed. The record before this Court at present simply is not developed sufficiently to reach conclusions on these issues.

For these reasons, both defendants' motion for summary judgment on the First Count and plaintiffs' cross-motion will be denied.

## C. Equitable Estoppel Claim

Plaintiffs allege that at the time of the 1991 merger between Infotron and GTI, and at various times afterwards, defendants represented to them that the severance benefits previously afforded to terminated employees would be continued. Plaintiffs allege these representations were untrue and constituted a breach of defendants' fiduciary duty under ERISA. By these intentional misrepresentations defendants induced these plaintiffs to stay at their jobs and caused them to suffer damages when they were terminated and given less severance than they had earned.[15]

Defendants concede that some plaintiffs allege that statements were made at the time of the 1991 Infotron/GDI merger and at various times following layoffs to the effect that the severance plan was not going to be changed. They contend, however, that plaintiffs were not told that the plan would never change or that it could not be changed. Further, defendants maintain that there is no evidence of a legally material statement or of detrimental reliance.

The parties have treated the plaintiffs' allegations as squarely stating equitable estoppel claims and this Court will do the same.[16] An ERISA participant may recover benefits under an equitable estoppel theory upon establishing a material misrepresentation, reasonable and detrimental reliance upon the misrepresentation, and extraordinary circumstances. *In re New Valley Corp.*, 89 F.3d 143, 153 (3d Cir.1996); *In re Unisys Corp. Retiree Med. Benefit "ERISA" Lit.*, 58 F.3d 896, 907 (3d Cir.1995); *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 235 (3d Cir.1994); *Smith v. Hartford Ins. Group*, 6 F.3d 131, 137 (3d Cir.1993).

There is undisputed evidence that in 1991, at the time the Infotron/GDI merger was being effected, then Chairman of GTI Des Cunningham represented to Infotron employees that Infotron's existing severance policy would not be changed, at least not for the worse.[17] There also is substantial evi-

on January 10, 1994, plaintiffs were terminated; and (5) plaintiffs had worked since January 1, 1978; then, (6) defendants would owe plaintiffs sixteen weeks' pay as severance even though they had worked under the terms of the unilateral contract for only seven days. The oddness of this result appears to be one obstacle plaintiffs will have to overcome in their bid to convince the fact finder that defendants intended to be bound in the manner plaintiffs suggest.

**15.** Plaintiffs' claim that by this conduct defendants discriminated against them in violation of 29 U.S.C.A. § 1140 was dismissed pursuant to this Court's Order dated July 5, 1996.

**16.** The Second Count of the Second Amended Complaint indicates that the 8 individual plaintiffs are the only plaintiffs seeking to recover on the estoppel claim. However, the Second Count of the Complaint in the original Civil Action No. 95-4808 states the equitable estoppel claim on

behalf of the 26 plaintiffs in the original unconsolidated action. Plaintiffs have indicated that they still are pressing the equitable estoppel claim for both groups of plaintiffs. While defendants' instant motion for summary judgment is addressed only to the 8 individual plaintiffs' estoppel claim, their legal argument applies with equal force to the other plaintiffs' estoppel claim as well. Because there appears to be no prejudice to either party in treating defendants' motion for summary judgment as to the Second Count of the Second Amended Complaint as also being addressed to the Second Count of the Complaint in No. 95-4808, this Court will so treat defendants' motion.

Plaintiffs appear no longer to be pursuing any breach of fiduciary duty claim.

**17.** This representation apparently was reduced to written form by defendants in a series of "Merger Letters." (See Plaintiffs' Exh. 2). Defendants dispute the authenticity of the Merger Letters.

dence that at various times following layoffs and continuing through January or February of 1994, GSC supervisory and managerial personnel assured anxious employees that the severance plan was not being changed and/or that it would stay the same.[18] Drawing all justifiable inferences from this evidence in favor of the respective nonmoving parties, this Court concludes that a fact finder reasonably could find either: (1) defendants misrepresented to plaintiffs that severance pay calculated under the Manual plan was guaranteed to them in the event of upcoming layoffs; or (2) defendants represented to plaintiffs simply that, as of the date of the representations, the Manual plan formula was in place and no formal changes had been made or initiated. Therefore, there is a genuine issue of material fact for the fact finder as to the existence of material·misrepresentations.

■ A finding that reliance on defendants' representations was reasonable—at least in the case of most plaintiffs—is supported though not required by the evidence. Plaintiffs had witnessed several prior layoffs in which those laid off received 1–3 weeks' pay.per year worked as severance. They

were told that financial conditions at the company were looking up and, in the event more layoffs were needed, the severance package would be the same. Of crucial importantly is that plaintiffs never had seen the Manual which contained the reservation of rights clause. Thus, this case is not one in which a claim of reasonable reliance is undercut by knowledge.of the employer's right to amend or terminate the severance plan. *Cf. In re Unisys,* 58 F.3d at 907–08. At the same time, however, plaintiffs by and large expected severance cuts in light of the generous terms of the Manual plan and defendants' declining financial condition. Drawing justifiable inferences from this evidence—and from various plaintiffs' deposition testimony that they knew severance "could" change—in favor of defendants, this Court concludes that a fact finder reasonably could conclude that plaintiffs' reliance on any misrepresentations was unreasonable. There is, therefore, a genuine issue of fact as to the reasonableness of plaintiffs' reliance.

■ As to detrimental reliance, plaintiffs contend that as a result of defendants' representations they abandoned plans of looking elsewhere for employment where job security

---

At this juncture this Court perceives no reason to address the admissibility of these writings as evidence.

18. *See, e.g.,* Axelrod Dep. at 9 (after every layoff there was meeting where questions were asked about severance "and we were always reassured the severance package would stay the same"); Booth Dep. at 14 (Ron Volkman said that as far as he knew benefits were going to stay the same but that a meeting was being held in Canada; Jerry Gainer said in January,' 1994, that separation pay formula would not change); Chambers Dep. at 69 (heard through grapevine that employees were told there would not be change in severance policy); DeMarco Dep. at 10 (at post-layoff meeting Ron Volkman would assure employees that severance package·was not going to change); Egerton Dep. at 22 (Matt Hottel said in meetings that benefits packages would stay the same and assured that nothing would change); Feizet Dep. at 27 (prior to February, 1994, Jerry Gainer said severance package would continue); Ford Dep. at 33 (following January, 1994, layoff GSC personnel said severance formula would not change); Fritter Dep. at 9 (from May 1991 to February, 1994, after every layoff representations were made that severance package was still·intact); Gildersleeve Dep. at 23 (employees were assured at meeting that if they were laid off they

would have severance); Harbaugh Dep. at 22 (following January, 1994, layoffs Ron Volkman said severance pay formula would stay the same); Kennedy Dep. at 13 (shortly after January 14 Ron Volkman said "severance would stay the same"); Luong Dep. at 17 (following January, 1994, layoffs Ron Volkman said there was no change in benefits); Maser Dep. at 18 ("all along when we asked [Ron Volkman], he assured us that everything would remain the same"); Merlino Dep. at 13 (at post-layoff meetings employees were reassured that talk of changed benefits was just rumors); Nguyen Dep. at 21 (following January, 1994, layoffs Jerry Gainer said nothing would change); Patel Dep. at 14 (after January, 1994, layoffs Ron Volkman denied rumor of severance cuts for those staying until April); Petrick Dep. at 12 (meetings with various officers would assure us severance pay formula was not going to change); Probasco Dep. at 28–29 (in approximately early February, 1994, Sandy LeFevre, Tom Aiken and Mike Rennie said benefits would stay the same and severance policy was not changing); Roselli Dep. at 30 (managers indicated that severance would stay the same); Scassero Dep. at 19 (following January, 1994, layoffs Volkman said to his knowledge there would be no change); Szumowski Dep. at 16 (following January, 1994, layoffs Tom Aiken said benefits and severance would remain same).

was stronger. It is undisputed that plaintiffs pressing the equitable estoppel claim continued to work for GSC after layoffs were conducted and after post-layoff representations were made to the effect that the severance policy had not changed and would remain the same. While the preference is for testimony or affidavits supporting a claim of detrimental reliance, *see generally Alexander v. Primerica Holdings, Inc.,* 967 F.2d 90, 96 (3d Cir.1992); *Pane v. RCA Corp.,* 868 F.2d 631, 638 (3d Cir.1989), a factfinder reasonably could find from the circumstances that plaintiffs were induced to remain with GSC instead of seeking alternative employment or otherwise taking steps to achieve the type of financial security they wrongly believed they had by virtue of defendants' severance policy. The amounts of money at stake in the expected severance awards were substantial and represented—*de facto* if not by design— a key component of the remaining employees' compensation packages and incentives for remaining at GSC.

Therefore, this Court is satisfied that under the circumstances the fact of continued employment is sufficient to allow plaintiffs to survive summary judgment on their equitable estoppel claim. It is not sufficient to allow them to prevail on their cross-motion however. Genuine issues of material fact remain with respect to when detrimental reliance, if any, was induced, and what harm various plaintiffs suffered. As defendants point out, plaintiffs' harm cannot be simply the difference between the severance pay plaintiffs would have received under the Manual plan and the amount they actually received under the modified plan, as there is no direct connection between the alleged misrepresentations and that loss; plaintiffs' harm will be the harm which flowed from actions they took or forbore from taking in reliance on defendants' representations.

As to extraordinary circumstances, this Court has little difficulty finding that they obtained in light of the number and scope of layoffs occurring in the relevant time period and the obvious need for plaintiffs to have accurate and complete information about their severance packages as they faced prospective unemployment.

For these reasons both defendants' motion for summary judgment as to plaintiffs' equitable estoppel claims and plaintiffs' cross-motion for summary judgment as to these claims will be denied. This Court notes that, with respect to the factual issues in dispute, ultimate resolution likely will require individualized hearings as to each plaintiff's circumstances. Additionally, hearings may be required to ascertain which plaintiffs were shown, or otherwise made aware of by defendants, the reservation of rights clause, since knowledge of the retained rights and contractual disclaimer would make reliance on the alleged misrepresentations *per se* unreasonable. *Hein v. Federal Deposit Ins. Corp.,* 88 F.3d 210, 222 (3d Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 683, 136 L.Ed.2d 608 (1997); *In re Unisys,* 58 F.3d at 908.

### D. *Procedural Violation Claims*

The Third Count of the Second Amended Complaint alleges: (1) defendants failed to provide plaintiffs with prompt notice of the purported modification to the benefits plan; (2) defendants failed to properly modify the benefits plan; and (3) defendants failed to furnish plaintiffs promptly with the applicable benefits summary. By these actions, it is claimed, defendants violated the procedural requirements of ERISA. Plaintiffs seek to have the February 17, 1994, severance plan modification declared void because GSC committed these alleged violations. Defendants deny any defects in the notice and disclosure of the severance amendment. They argue that any technical procedural violations of ERISA cannot give rise to substantive remedies here.

### 1. *Timeliness of Notice of Modification*

■ The timing of the notice of amendment did not violate ERISA's procedural requirements. Notice of a plan modification or change must be provided to plan participants not later than 210 days after the end of the plan year in which the change is adopted. 29 U.S.C.A. § 1024(b)(1) (1985). Whatever the exact date of the severance amendment's adoption, defendants clearly satisfied § 1024(b)(1). Insofar as plaintiffs have stated a claim that the severance plan modifica-

tion is void because of the timing of defendants' notice of the modification, defendants are entitled to summary judgment on that claim.

### 2. *Adherence to Modification Procedure*

■ By memorandum dated February 8, 1994, defendants advised plaintiffs that GSC "reserve[d] the option to amend, modify or terminate benefits." The attached summary benefits description·went further, indicating that GSC reserved the right to terminate, modify, suspend or amend any employee benefits, at any time for any reasons *within the discretion of the President and Chief Executive Officer* (then Frank Jerd). It stated that "[a]ny such changes will be implemented by written resolution of the President & Chief Executive Officer." By memorandum dated February 17, 1994, defendants noticed plaintiffs of the new severance pay formula and cap.

Neither defendants nor plaintiffs are entitled to prevail on their motions for summary judgment on the claim that defendants' severance plan was modified improperly. ERISA requires that benefit plans contain "a procedure for amending such plans and for identifying the persons who have the authority to amend the plan." 29 U.S.C.A. § 1102(b)(3) (West 1985); *see Curtiss-Wright Corp. v. Schoonejongen,* 514 U.S. 73, 75, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995). Adherence to the formal amendment procedure is required in order for a plan amendment to be·valid. *Inter–Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, ——, 117 S.Ct. 1513, 1516, 137 L.Ed.2d 763 (1997); *Curtiss–Wright Corp.,* 514 U.S. at 84–85; *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 125 (3d Cir.1995); *In re Unisys Corp. Long-Term Disability Plan Erisa,* MDL No. 938, 1997 WL 137370 at *2 (E.D.Pa. Mar.25, 1997); *see also Brewer v. Protexall, Inc.,* 50 F.3d 453, 457 (7th Cir.1995); *Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1454 (4th Cir.1992) (Wilkinson, J., concurring);

*Washington Nat. Ins. Co. v. Hendricks,* 855 F.Supp. 1542, 1557 (W.D.Wis.1994).

Standing alone, a provision stating that the Company may amend, modify or terminate plan benefits is sufficient to satisfy ERISA's amendment procedure requirements. *Curtiss–Wright,* 514 U.S. at 78–84. But, on one reading, the benefits description here appears to go further, requiring that changes be made at the discretion of the President and Chief Executive Officer of GSC. On this reasonable reading, Jerd's participation in, or at least his ratification of, any amendment action was indispensable.[19] Plaintiffs present evidence that the February 17, 1994, modification notice was not written or reviewed by Jerd. Thomas Aiken, GSC's Chief Financial Officer, has stated that it was not customary or normal·for a memorandum to lack a signature, that he believed the memorandum was issued by Vincent Messina, that he did not believe Jerd had been involved in issuing the memorandum because it lacked his signature, and that he believed the memorandum was dictated for issuance under Jerd's signature. (Aiken Dep. at 93). Vincent Messina has testified as to his recollection that the amendment was sent to GSC's Human Resources department by Jeff Singer who worked in Canada. (Messina Dep. at 82–83). Singer testified that Hedges made the actual decision to amend the severance plan. (Singer Dep. at 75). However, Jerd did attend portions of GTI Board meetings in the relevant time period. He was present at a January 24–25, 1994, Operations Committee meeting during which Hedges instructed those present to prepare business·case scenarios involving downsizing for presentation at the February 10, 1994, Board meeting. Finally, the February·17 memorandum did bear Jerd's name.

This evidence is sufficient to permit a fact finder reasonably to conclude that Jerd exercised discretion either in the decision to modify the plan or at least in ratifying that decision, but it also is sufficient to support

---

**19.** This Court does not believe that this reading is the only reasonable reading. Given the record and the lack of briefing on this point, the Court finds ambiguity. For purposes of disposing of defendants' motion for summary judgment, how-

ever, this Court utilizes this reading since, insofar as defendants are the moving party and have not carried their initial burden of showing the absence of a genuine issue of material fact in this regard. *See* Fed.R.Civ.P. 56. .

the opposite conclusions. There is, in short, on one reading of the amendment procedure which defendants have not discredited, a genuine issue of material fact as to whether the severance modification involved an exercise of discretion on Jerd's part. For this reason, this Court will deny both defendants' motion for summary judgment and plaintiffs' cross-motion as to the improper modification claim.[20]

### 3. Provision of Summary Plan Description

Although the severance plan was in effect at least as early as 1984, there appears to be no evidence that plaintiffs received a summary plan description (SPD) from GSC prior to February, 1994, at least not one which addressed severance pay.

As mentioned above, ERISA requires in the way of plan disclosure, *inter alia*, that participants be given SPDs. 29 U.S.C.A. § 1021(a)(1). Violations of ERISA's procedural requirements give rise to substantive relief such as a rescission of a plan amendment only in egregious circumstances involving, for example, bad faith and active concealment of plan terms. *See Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124 (3d Cir.1995). Plaintiffs have done no more than allege a failure to provide a timely SPD. This Court will not develop for plaintiffs an argument that procedural violations here were sufficient to warrant substantive relief. Insofar as plaintiffs have stated a claim that defendants' failure to provide an SPD on a timely basis must result in the severance plan modification being declared void, defendants are entitled to summary judgment on that claim.[21]

### E. WARN Claims

Class Two and Class Three plaintiffs allege that defendants violated the Worker Adjustment and Retraining Notification Act ("WARN"), 29 U.S.C.A. § 2101 *et seq.*, by terminating their employment without providing sixty days' notice.[22]

WARN provides that "[a]n employer shall not order a plant closing or mass layoff until the end of a sixty-day period after the employer serves written notice of such an order ... [to each affected employee]." 29 U.S.C.A. § 2102(a) (West Supp.1997). "Plant closing" is defined as "the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees." *Id.* § 2101(a)(2). The term "affected employees" is defined as "employees who may reasonably be expected to experience an employment loss as a consequence of a proposed plant closing or mass layoff by their employer." *Id.* § 2101(a)(5). The term "employment loss" is defined, in pertinent part, as "an employment termination, other than a dis-

---

20. Defendants are correct that procedural ERISA violations ordinarily will not create substantive rights not provided in a plan. *See Ackerman v. Warnaco, Inc.*, 55 F.3d 117, 124 (3d Cir.1995); *Berger v. Edgewater Steel Co.*, 911 F.2d 911, 921 (3d Cir.1990), *cert. denied*, 499 U.S. 920, 111 S.Ct. 1310, 113 L.Ed.2d 244 (1991). This case, however, is not one in which the finding of a violation of an ERISA procedural requirement might operate to give plan participants a substantive right not contained in the plan. If the amendment procedure required Jerd's involvement, and this procedure was not followed, then the severance policy modification is without force. In that scenario substantive rights under the plan would not be *created*, they simply would be *retained*. Put differently, the point is that the instant claim involves an alleged violation of the terms of the severance plan, not a violation of ERISA's procedural requirements.

21. It is important to make clear that this decision and the decision in III.D.1—to the effect that technical violations of ERISA here do not result in the severance plan modification being void—are not at all inconsistent with this Court's decision that plaintiffs may have a right to vested severance benefits. The decisions in III.D.1 and III.D.3 simply establish that the plan modification was not void *ab initio* because of technical violations, while the discussion and decision in III.B. is addressed to the *effect* that the plan modification has on plaintiffs' benefits. That is, III.B. established that the plan modification—assumed to be valid—may not have the effect on plaintiffs' benefits that defendants believe it does, because plaintiffs' benefits may have been vested and irrevocable.

22. Class Two plaintiffs were laid off on or about February 22, 1994. Class Three plaintiffs were laid off on or about January 14, 1994.

charge for cause, voluntary departure, or retirement." *Id.* § 2101(a)(6)(A).

The operation of WARN is straightforward. First a determination is made as to whether there was a "plant closing" as defined by WARN. The court then looks to see which employees were employees "affected" by the plant closing.[23] Finally, the court finds whether or not the plant closing was ordered without affected employees having been given sixty-days' notice.

■ It is known that management decided to shut down the Cherry Hill facility prior to February 22, 1994, the date on which actual notice of the closing was given. Thereafter, GSC terminated thirty-four employees on April 25, fourteen employees on April 29, and six employees on May 2.[24] Thus, in less than thirty days, fifty-four GSC employees "experienced an employment loss as a consequence of a proposed plant closing." *Id.* § 2101(a)(5). Therefore, there was a "plant closing" as defined by WARN. *See id.* § 2101(a)(2). By definition, all employees at GSC as of February 22, 1994, were "affected employees" to whom GSC was required to give sixty-days' notice, because they all reasonably could be expected to experience an employment loss as a result of the planned plant closing. *See id.* § 2101(a)(5). Summary judgment will be granted to all Class Two plaintiffs who did not receive the sixty-days' WARN notice of the plant closing, including those employees laid off on February 22, 1994, and defendants are obligated to award such employees back pay pursuant to 29 U.S.C.A. § 2104(a).

■ Defendants attempt to avoid this result by arguing that WARN's plant closing provisions do not have "retroactive application." That is, defendants assert that only those plaintiffs scheduled to be laid off on or after April 25, 1994—when there were plans to shut down the Cherry Hill facility—can be said to have experienced "employment loss" which "resulted from" a plant shutdown. Apart from ignoring the plain language of the statute, defendants overlook the fundamentally forward-looking orientation of WARN's definition of "affected employees"—those employees "who may reasonably be *expected* to experience an employment loss as a consequence of a *proposed* plant closing . . . ." *Id.* § 2101(a)(5). Their argument produces an absurd result. Under defendants' argument, an employer is free to plan a Wednesday plant closing on Monday, lay off all of its employees on Tuesday, and then claim that there are no employees "affected" by Wednesday's closing because—as all employees were laid off on Tuesday—there could not be any employees on Wednesday to experience an employment loss as a result of the closing.

The circumstances of Class Three plaintiffs are more difficult to determine. This Court concludes that neither Class Three plaintiffs nor defendants are entitled to summary judgment on Class Three plaintiffs' WARN claim. Again this Court's analysis begins with the undisputed fact that there was a plant closing in April of 1994. If GSC had at some time prior to January 14, 1994, already determined to close the Cherry Hill facility, then the Class Three plaintiffs were "affected" employees who did not receive a proper WARN notice.

■ This Court is satisfied that there is a genuine dispute of fact concerning whether or not prior to January 14, 1994, defendants were planning to close GSC's Cherry Hill facility. A fact finder reasonably could infer from the circumstances and timing of the

---

23. There is nothing in the statute to suggest any limitation on which employees may be counted to make up the required fifty or more "affected" employees, who can include those who received a proper WARN notice, those who did not receive such notice, those laid off before notice of the proposed closing was given, or those laid off after the closing was announced. The only legal requirement is that there be a causal link between the employee's termination and the plant closing. Neither does WARN limit "affected" employees to those included in the fifty or more employees used to define a "plant closing." Once that definition is satisfied, any employee may qualify as an "affected" employee, whether or not included in the group of employees used to define a "plant closing."

24. A schedule showing the dates and numbers of layoffs is attached at the end of this Opinion as "Appendix A." An additional schedule, annotated to clarify the parties' factual disagreements, is attached as "Appendix B."

layoffs that the employees terminated on January 14, 1994, were terminated as part of a multi-staged plant closing. At the same time, a fact finder reasonably could infer from defendants' evidence that as of January 14, 1994, defendants were not planning or proposing a plant closing. That is, a fact finder could find that the decision to terminate Class Three plaintiffs on January 14, 1994, predated any plans or proposals to close the plant, and that therefore these plaintiffs could not be reasonably expected to suffer employment losses as a consequence of the April plant closing.

■ Defendants will bear the burden of proving that Class Three plaintiffs (i.e., those terminated on January 14, 1994) were not "affected employees" under WARN, a burden requiring them to show that Class Three plaintiffs' terminations were planned prior to any serious proposal or decision being made to close GSC's Cherry Hill plant. This burden-shift flows from: (1) the existence an undisputed plant closing in April of 1994; and (2) WARN's provision that employment losses within a ninety-day period may be grouped together for purposes of showing a plant closing unless the employer can show that such losses resulted from "separate and distinct actions and causes and are not an attempt by the employer to evade the requirements" of WARN. *See id.* § 2102(d).[25]

Had plaintiff been required to rely on the January 14, 1994, layoffs to establish a plant closing under the expanded ninety-day window provided by § 2102(d), defendants would have borne the burden of proving that these layoffs were not causally related to the plant closing. It is undisputed that those laid off on January 14 suffered an employment loss. *Id.* § 2101(a)(6). If that date is included within any number of possible ninety-day periods, more than fifty employees would have suffered an employment loss during such periods. To avoid a finding of a "plant closing" defendants would have been required to bear the burden of proving that such employment losses were "the result of

separate and distinct action and causes and are not an attempt by the employer to evade the requirements of this chapter." *Id.* Defendants should not be able to escape this burden because a staged lay off satisfied the basic plant closing definition found in § 2101(a)(2).

In conclusion, defendants' motion for summary judgment as to Class Two plaintiffs' WARN claim will be denied. Plaintiffs' cross-motion for summary judgment as to Class Two plaintiffs' WARN claim will be granted. Defendants' motion for summary judgment as to Class Three plaintiffs' WARN claim will be denied. Plaintiffs' cross-motion for summary judgment as to Class Three plaintiffs' WARN claim also will be denied.

## IV. Conclusion

For the foregoing reasons, this Court finds Subclass "A" plaintiffs lack standing to pursue claims under ERISA and their Complaint must be dismissed. Both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to plaintiffs' claim that they are entitled to vested benefits will be denied. Both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to all plaintiffs' equitable estoppel claims will be denied. Defendants' motion for summary judgment as to plaintiffs' claims that the severance plan modification must be declared void because plaintiffs were not timely noticed of the severance policy modification and were not timely given a summary plan benefits description will be granted, and plaintiffs' cross-motion for summary judgment as to these claims will be denied. Both defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment as to plaintiffs' claim that the severance policy modification was invalid will be denied. Defendants' motion for summary judgment as to Class Two plaintiffs' WARN claim will be denied, and plaintiffs' cross-motion for summary judgment as to this claim will be granted. Both defendants' motion for sum-

---

**25.** Because of the manner in which this Court disposes of the WARN plant closing claims, it will not consider plaintiffs' alternative WARN "mass layoff" claims. This Court is satisfied from the evidence that Class Three plaintiffs can prevail on their WARN claim only if they were employees "affected" by the WARN plant closing which this Court has found did in fact occur.

mary judgment and plaintiffs' cross-motion for summary judgment as to Class Three plaintiffs' WARN claim will be denied. This Court will enter an appropriate order.